NO. COA13-330

NORTH CAROLINA COURT OF APPEALS

Filed: 21 January 2014

STATE OF NORTH CAROLINA

    v.                            Wilkes County
                                  No. 11 CRS 54425
CHARLES ANTHONY MCGRADY


    Appeal by Defendant from judgment entered 8 August 2012 by

Judge R. Stuart Albright in Wilkes County Superior Court. Heard

in the Court of Appeals 9 October 2013.


    *Attorney General Roy Cooper, by Assistant Solicitor General
    Gary R. Govert, for the State.*

    *Rudolf Widenhouse & Fialko, by M. Gordon Widenhouse, Jr.,
    for Defendant.*


    STEPHENS, Judge.


                *Factual and Procedural Background*

    This case arises from the death of James Allen Shore, Jr.

("the decedent"), who was shot by Defendant Charles Anthony

McGrady in a field near both individuals' homes. Defendant and

the decedent are first cousins and were involved in a number of

disputes during the decedent's life. On 6 February 2012,

Defendant was charged with first-degree murder. The trial began

on Monday, 30 July 2012, and continued through the following

Wednesday. The evidence presented at trial tended to show the following:

At the time of the shooting, the decedent lived on the western side of Wiles Ridge Road with his fiancée, Tammy Wood ("Wood"), in Hays, North Carolina. Defendant and his girlfriend, Darlene Kellum, lived on the eastern side of the road, opposite the decedent. Defendant's son, Brandon McGrady ("Brandon"), lived approximately 400 feet to the northwest of his father's home. Defendant's aunt and the decedent's mother, Betty Shore, lived on the western side of the road. The area encompassing these homes is approximately nine acres.

In the early morning hours of 20 December 2011, the decedent took his dog for a walk outside his house. Afterward, he returned home upset and told Wood that Defendant had been shining a light on him. Later that morning, around 10:00 a.m., the decedent got up, walked his dog to his mother's house, and told her the same thing. He was wearing a knife on his waist, attached by a rope, and carrying a walking stick. After talking with his mother, the decedent walked back toward his house with his dog. On the way, he came in contact with Defendant and Defendant's son, Brandon, who were riding together in a golf cart to get the mail. Defendant was seated in the driver's seat,

and Brandon was seated in the passenger seat. Defendant was carrying a loaded, 9-millimeter Beretta pistol in his right pocket and an audio cassette player in his left hand. Brandon had a loaded AR-15 semi-automatic rifle between his legs.

While Defendant and Brandon were checking the mail, they saw the decedent walking toward the golf cart. Shortly thereafter, Defendant and the decedent started arguing, and Defendant began recording with his cassette player. Speaking to the decedent, Defendant asked, "Do you have anything to add about murdering my family last night?" The decedent responded, "No, I plainly told you." Defendant repeated his question and the decedent told him to "shut the fuck up." More arguing occurred, and Defendant told the decedent to "stay away from us." The decedent responded, "You know I'll whoop your ass and put you on the ground if you try to stab me in the back; now get over here and get some." Defendant responded by saying, "I'll put you in the grave; in the morgue, in the morgue, motherfucker."

The argument continued, and the decedent put his hands on the golf cart, shaking it. Defendant asked Brandon to give him the AR-15. As Brandon attempted to hand it to his father, the decedent took the AR-15 and stood back, pointing it at Defendant

and his son. Brandon got out of the golf cart, but Defendant remained seated. After exchanging more insults with the decedent, Defendant stepped out of the golf cart, pulled out his pistol, and fired approximately seven shots at the decedent in rapid succession.[1] Afterward, Defendant said to the decedent, "What about now, Bozo? What about now, motherfucker, huh?" He then proclaimed that the decedent "attacked us, by God" and returned to his house with his weapons and son.

The decedent died shortly thereafter, at 12:35 p.m. According to the medical examiner, some of the bullets entered the decedent's arm and then reentered his torso, making it difficult to calculate an exact number of shots. Other bullets entered the decedent's back. The medical examiner testified that there were gunshot wounds in the upper part of the decedent's buttocks, going from left to right. There were also two gunshot wounds in the decedent's torso. The lower wound was fatal, resulting from a "straight-on shot" into the decedent's back that went through his lung and into his heart.

Defendant was eventually taken into custody and charged with first-degree murder. At trial, Defendant testified that the decedent was pointing the AR-15 at Brandon's head and he shot

---

[1] The shots were fired in 1.82 seconds.

the decedent "out of instinct, to protect my son." At the close of all the evidence and after the parties' arguments, the trial court instructed the jury on, *inter alia*, self-defense and defense of a family member. On 8 August 2012, Defendant was convicted of first-degree murder and sentenced to life imprisonment without parole. He gave notice of appeal that same day.

*Discussion*

Defendant makes two arguments on appeal. First, he contends that the trial court abused its discretion by excluding the expert testimony offered by Defendant regarding the doctrine of "use of force," in violation of his right to present a defense. Second, Defendant asserts that the trial court erred by preventing him from introducing evidence of the decedent's "proclivity toward violence based on his reputation and his previous violent actions." We find no error.

*I. Expert Witness Testimony on Use of Force*

It is well-established that trial courts must decide preliminary questions concerning the qualifications of experts to testify or the admissibility of expert testimony. . . . In this capacity, trial courts are afforded wide latitude of discretion when making a determination about the admissibility of expert testimony. Given such latitude, it follows that a trial court's ruling on the qualifications of an

> expert or the admissibility of an expert's opinion will not be reversed on appeal absent a showing of abuse of discretion.

*Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004) (citations and quotation marks omitted). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988).

### A. Voir Dire

On 30 July 2012, the State filed a motion *in limine* to exclude the testimony of Dave F. Cloutier. A *voir dire* hearing on that motion was held at trial. During the hearing, Cloutier testified on the "science" of "use of force" as applied to the facts of this case. Specifically, he discussed the concepts of (1) "reaction time," (2) an individual's response to perceived lethal and nonlethal force, (3) "force variables," (4) "pre-attack cues," and (5) "perceptual narrowing." Cloutier described "reaction time" as "the time it takes [to react] once the brain has perceived a threat — [the perception of such a threat is]

usually visual, by the eyes, although it could be with other senses."[2] He defined "force variables" as

> circumstances and events that would . . . influence someone's decision of a use of force that was necessary to overcome a perceived threat. That could include the actual weapons involved, the number of weapons, the number of individuals, the environment, the time of day, the lighting, any number of variables.

"Pre-attack cues" are "those exhibitions by an individual which an individual would actually perceive or view and make the assumption that an attack was likely." For example, "a glaring look in [an individual's] face, a clinched jaw, . . . clinched fist," or bringing a weapon up as if to fire. Finally, "perceptual narrowing" is "the reason people have a tendency to not have a total recall of what actually may have happened [during an altercation]." According to Cloutier, perceptual narrowing could result in difficulty remembering, for example, "the number of shots that may have been fired in an actual lethal encounter."

---

[2] He elaborated: "[B]y the time the individual perceives a threat, recognize[s] it as a threat, and makes the decision to begin to use some technique, tactic, or method to either flee or fight[, i]t usually takes the average person about three-quarters of a second to begin to react to some stimulus that they perceive as a threat. So we utilize that reaction time in analyzing these various cases."

Regarding his experience and training in the field, Cloutier testified that he had worked in "use of force" since January of 1991. At the time of the trial, he was a "private citizen" who provided "expert witness services in regards to use of force . . . ." Before that, he worked for the North Carolina Department of Justice as an instructor "for subject control and arrest techniques for law enforcement training . . . " and served in the military. He holds a bachelor of science degree in criminal justice from North Carolina Wesleyan College and is a graduate of the FBI National Academy. He has held certifications in (1) firearms instruction, (2) subject control and arrest techniques, (3) specialized subject control, and (4) unarmed self-defense. At the time of trial, however, he was certified only as an "FBI defensive tactics instructor . . . ." Before the trial, Cloutier had been admitted as an expert approximately twenty-two times in state and federal court. Cloutier does not have a Ph.D or any medical degree.

Applying the use of force doctrine to the facts in this case, Cloutier offered the following observations: (1) The decedent exhibited a number of pre-attack cues that might have indicated a forthcoming assault. (2) "[A]ge, gender, size, environment, use of a weapon, type of weapon, number of weapons,

and . . . number of subjects" were "use of force variables" present in this case and, along with the pre-attack cues, these factors were "consistent with exhibition by an individual that an attack was likely imminent." (3) The rounds fired at the decedent were fired in "somewhere around 1.8 seconds . . . [, meaning] it's very possible and likely that during the course of firing in that 1.8 seconds that [the decedent] could have, in fact, [reacted and] turned 90 to 180 degrees, or, in fact, could have turned 360 degrees," accounting for the injuries in his side and back. In addition, (4) Defendant was possibly affected by perceptual narrowing.

When Cloutier was questioned about the scientific basis for his opinions, he testified that his knowledge came from published articles in the field of use of force and the training he received "by some of those authors and studies that I have myself been involved in . . . ." He explained that the "Justice Academy" uses "a number of tests . . . to look at various principles of use of force . . . ." According to Cloutier, this information is regularly relied on by people in the field. When asked to explain the reliability of the information described in his testimony, Cloutier explained:

> The tests, for example, that I have been a
> part of performing and been involved in with

> the Justice Academy . . . measure the physiological results of an individual under stress and their reaction time; once they perceive a threat, how long it takes to react and what type of reaction they have. Those results of those studies that we have performed at the Justice Academy are consistent with the studies that have been performed and published on a national basis.

According to Cloutier, these tests have "remained consistent over time." When asked to describe the "known or potential rate of error," however, Cloutier admitted that he did not know.[3]

At the end of the hearing, the trial court sustained the State's objection and excluded Cloutier's testimony in its entirety. The court pointed out that (1) much of Cloutier's report constituted impermissible witness bolstering, (2) certain of Cloutier's opinions were based on medical knowledge that he was not qualified to discuss, (3) Cloutier's opinion on use of force variables would not be helpful to the jury because most individuals are able to recognize pre-attack cues and other use of force variables, and (4) Cloutier is not competent to testify about reaction times. In addition, the court determined that Cloutier's "testimony [was] not based on sufficient facts or data. . . . [,] not the product of reliable principles or

---

[3] Cloutier later stated: "I have not done[ a] statistical analysis on any of these studies or read a statistical analysis."

methods. . . . [, and] simply a conclusory approach that [could not] reasonably assess for reliability." The court noted that Cloutier's testimony had not been subject to peer review, Cloutier had no knowledge of a potential rate of error regarding any of the use of force factors, and Cloutier did not recognize or apply the variables that could have affected his opinions in the case. As a result, the court concluded that Cloutier's "opinions . . . [were] . . . based on speculation. He[ was] just guessing and overlooking a very important part of what could very well affect his opinions in this case." It also found, "[n]otwithstanding all those findings," that the probative value of Cloutier's testimony was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury" under Rule 403 of the North Carolina Rules of Evidence.

*B. Legal Background*

Rule 702 states, in pertinent part, that

> (a) if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
>
> (1) The testimony is based upon

sufficient facts or data.

(2) The testimony is the product of reliable principles and methods.

(3) The witness has applied the principles and methods reliably to the facts of the case.

N.C. Gen. Stat. § 8C-1, Rule 702(a) (2013). Rule 702(a) was amended to read as quoted above, effective 1 October 2011. 2011 N.C. Sess. Laws 400, § 1(c) (S.B. 33); 2011 N.C. Sess. Laws 283, § 1.3 (H.B. 542). The earlier version of the rule did not include the criteria listed in subsections (1)–(3), but was otherwise the same. *See id.*

Though our appellate courts have not addressed in detail the significance of the October 2011 amendment to Rule 702, this Court has noted that the current, amended "language . . . implements the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579,[] 125 L. Ed. 2d 469 (1993)." *Wise v. Alcoa, Inc.*, __ N.C. App. __, __ n.1, __ S.E.2d __, __ n.1 (2013); *see also State v. Hudson*, __ N.C. App. __, 721 S.E.2d 763 (2012) (unpublished opinion), *available at* 2012 WL 379936. That observation comports with the bill analysis provided to the Senate Judiciary Committee which reviewed the amendment. *See* Committee Counsel Bill Patterson, 2011–2012

General Assembly, *House Bill 542: Tort Reform for Citizens and Business* 2-3 n.3 (8 June 2011) ("As amended, Rule 702(a) will mirror Federal Rule 702(a), which was amended in 2000 to conform to the standard outlined in *Daubert* . . . ."); *see generally* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589, 125 L. Ed. 2d at 469. This new language represents a departure from our previous understanding of Rule 702, which eschewed the Supreme Court's decision in *Daubert*. *Howerton*, 358 N.C. at 469, 597 S.E.2d at 693 ("North Carolina is not, nor has it ever been, a *Daubert* jurisdiction."). Given the changes wrought by our legislature, however, it is clear that amended Rule 702 should be applied pursuant to the federal standard as articulated in *Daubert*.

In the *Daubert* case, the United States Supreme Court defined a gatekeeping role for trial judges. *Daubert*, 509 U.S. at 597, 125 L. Ed. 2d at 485 ("We recognize that [such a role], no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations."). Accordingly, an expert must first base his testimony on "scientific knowledge," which "implies a grounding in the methods and procedures of science," in order for that testimony to be admissible. *Id.* at 590, 125 L. Ed. 2d at 480-81. The Court explained this requirement in detail as follows:

> [T]he word "knowledge" connotes more than subjective belief or *unsupported speculation*. The term applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds. . . . [I]n order to qualify as "scientific knowledge," an inference or assertion *must be derived by the scientific method*.[4] Proposed testimony must be supported by appropriate validation — *i.e.,* "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Id.* at 590, 125 L. Ed. 2d at 481 (emphasis added). Second, an expert's testimony must assist the trier of fact to understand the evidence or determine a fact in issue. *Id.* at 591, 595, 125 L. Ed. 2d at 481, 483-84. "The focus, of course, must be solely on *principles and methodology*, not on the conclusions that they generate." *Id.* at 595, 125 L. Ed. 2d at 484 (emphasis added).

It is the trial court's responsibility to determine "whether the expert is proposing to testify to (1) scientific knowledge" and whether that knowledge "(2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 125 L. Ed. 2d at 482. In deciding whether the proffered

---

[4] The "scientific method" is "[a]n analytical technique by which a hypothesis is formulated and then systematically tested through observation and experimentation." *Black's Law Dictionary* 1463-64 (9th ed. 2009).

scientific theory or technique will assist the trier of fact, the trial court may consider, among other things, (1) "whether [a theory or technique] can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error . . . and the existence and maintenance of standards controlling the technique's operation," and (4) whether the theory or technique is generally accepted as reliable in the relevant scientific community. *Id.* at 593-94, 125 L. Ed. 2d at 482-83. This inquiry is "a flexible one," *id.* at 594, 125 L. Ed. 2d at 483-84, and remains reviewable under the abuse of discretion standard. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147, 139 L. Ed. 2d 508, 519 (1997).

*C. Analysis*

Defendant argues that the trial court erroneously excluded Cloutier's testimony under Rule 702 and, in doing so, abused its discretion. Specifically, Defendant asserts that "use of force is a science," based on scientific principles and utilized by other experts. He states that concepts like "reaction time" are based on "reliable" studies, which were cited by Cloutier, and points out that Cloutier unearthed a number of "use of force variables that came into play in this situation. . . . Most

important[ly], Cloutier explained that [the decedent] could have turned 90 to 180 degrees in 1.8 seconds," the amount of time it took Defendant to fire the shots. Defendant argues that this fact, in particular, could have assisted the jury in determining that Defendant used "defensive force" in the confrontation with the decedent. Defendant also argues that expert testimony "should be liberally admitted" and that the trial court "unfairly interject[ed] itself into the litigation" and disregarded the liberal admission precept. In conjunction with the above argument, Defendant contends that the trial court's decision to exclude Cloutier's testimony violated his constitutional right to present a defense. We disagree.

*(1) Rule 702*

In *Joiner*, the United States Supreme Court reviewed a trial court's application of the *Daubert* test. 522 U.S. at 136, 139 L. Ed. 2d at 508. The respondent-employee worked as an electrician for the petitioner-employer. *Id.* at 139, 139 L. Ed. 2d at 514. By expert testimony, the employee linked the development of his cancer to his exposure to certain chemicals used by his employer. *Id.* at 139-40, 139 L. Ed. 2d at 514. In providing that testimony, the experts relied on a number of specific scientific studies. *Id.* at 143-44, 139 L. Ed. 2d at 517. Nonetheless, the

trial court excluded the proffered testimony on grounds that it did not rise above "subjective belief or unsupported speculation." *Id.* at 140, 139 L. Ed. 2d at 515. On appeal, the circuit court reversed the trial court, citing a general "preference" for the admission of expert testimony.[5] *Id.* The United States Supreme Court reversed that decision on writ of *certiorari* and affirmed the trial court's original decision to exclude the expert testimony. *Id.* at 141, 139 L. Ed. 2d at 515.

In his argument to the Supreme Court, the employee asserted that the trial court's disagreement with the experts' conclusions was error because the experts had relied on the specific *principles* and *methodology* used in the cited studies, pursuant to the requirements laid down in *Daubert*. *Id.* at 146, 139 L. Ed. 2d at 518. The Supreme Court overruled that argument and stated that, while the focus of a trial court's analysis must be on principles and methodology,

> conclusions and methodology are not entirely
> distinct from one another. . . . [N]*othing*
> . . . *requires* a [trial court] to admit
> opinion evidence that is connected *to*
> existing data only by the *ipse dixit*[6] of the

---

[5] Such "preference" is not unlike the liberal admission precept invoked by Defendant in this case.

[6] *Ipse dixit* is Latin for "he himself said it" and defined as "[s]omething asserted but not proved[.]" *Black's Law Dictionary*

> expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.* at 146, 139 L. Ed. 2d at 519 (emphasis added). Citing the highly deferential standard afforded to a trial court's decision to exclude or admit expert testimony, the Court concluded that the trial court did not abuse its discretion in excluding the employee's expert testimony and in determining that the analytical gap between the data and the opinion in that case was too great. *Id.*

In this case, just as in *Joiner*, the trial court determined that there was too great an analytical gap between the authorities cited by Cloutier and his offered opinion. Specifically, the court concluded that Cloutier's testimony was not based on sufficient facts or data or the product of reliable principles and methods. The trial court also noted that (1) the testimony served as "simply a conclusory approach that cannot reasonably assess for reliability" and (2) Cloutier had failed to provide any known rate of error or show that any of the referenced studies were the subject of peer review. For those reasons, the trial court determined that Cloutier's testimony was merely "based on speculation" and commented that "[Cloutier]

---

905 (9th ed. 2009).

is just guessing and overlooking [variables that] could . . . affect his opinions in this case."

Defendant contests the trial court's conclusions and asserts that it abused its discretion in coming to those conclusions, but does not show how the court's decision was arbitrarily or manifestly unreasonable. Rather, he argues for the reasonableness of a *different* conclusion based on the same evidence.[7] This demonstrates a misunderstanding of the abuse of discretion standard.

The federal courts have traditionally granted "a great deal of discretion" to the trial court when determining whether expert testimony is admissible under *Daubert*. *See, e.g.*, *U.S. v. Dorsey*, 45 F.3d 809 (4th Cir. 1995); *Maryland Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780 (4th Cir. 1998) ("*Daubert* clearly contemplates the vesting of significant discretion in the district court with regard to the decision to admit expert scientific testimony."). As the State points out in its brief, Cloutier provided little data to support the reliability of his proposed methodology. Though Cloutier testified that (1) use of

_____

[7] We also note that Defendant does not address the trial court's determination that the testimony is inadmissible under Rule 403.

force has been "tested," (2) publications exist in the field,[8] and (3) the theory is "relied upon regularly," he provided no substantive reasons — no specific scientific knowledge, methods, or procedures — to support those assertions. Indeed, unlike the experts in *Joiner*, Cloutier was not even able to cite a single specific study, merely referring to the existence of studies and their authors generally. In addition, when the court asked about the relevant "rate of error," Cloutier admitted that he knew nothing about that factor or how it related to his opinions.

A review of the trial transcript indicates that, in excluding Cloutier's testimony, the trial court properly applied the standard laid down by the Supreme Court in *Daubert*. The court determined that Cloutier's testimony was firmly within the realm of common knowledge and would not be helpful to the jury. The Court pointed out that Cloutier completely lacked medical credentials and provided little evidence regarding the principles or methodology used to come to his conclusions. Therefore, even if we were to assume that the doctrine of "use

---

[8] Cloutier stated that he had read and even participated in some of the studies leading to these publications. Nevertheless, he was completely unable to provide details regarding their content.

of force" constitutes scientific knowledge,[9] we see no reason to conclude that the trial court was manifestly unreasonable in determining that Cloutier's knowledge of that doctrine — including the way an individual reacts in a confrontation or the fact that an individual might turn away when a gun is fired — was not helpful to the jury. *See generally Braswell v. Braswell*, 330 N.C. 363, 377, 410 S.E.2d 897, 905 (1991) ("When the jury is in as good a position as the expert to determine an issue, the expert's testimony is properly excludable because it is not helpful to the jury.") (citation omitted). In our view, the court's decision was well-reasoned, especially given the *Daubert* requirements invoked by amended Rule 702. Therefore, Defendant's first argument is overruled, and we affirm the trial court's decision to exclude Cloutier's testimony under Rule 702.

*(2) Right to Present a Defense*

Defendant also contends that the exclusion of Cloutier's testimony under Rule 702 violated his constitutional right to

---

[9] We do not offer an opinion as to whether it does. We note, however, that Cloutier offered scant evidence to support that fact *in this particular case*. Merely referencing scientific studies and explaining the meaning of apparent scholarly terms like "perceptual narrowing" – without providing a more substantial basis on which to ground one's opinion — does not fit with the *Daubert* Court's intent that expert testimony be based on *scientific knowledge.*

present a defense under the Sixth Amendment of the United States Constitution and Article I, section 23 of the North Carolina Constitution. We disagree.

The right to present a defense is not absolute. *U.S. v. Prince-Oyibo*, 320 F.3d 494, 501 (4th Cir. 2003). Criminal defendants do not have a right to present evidence that the trial court, in its discretion, deems inadmissible under the rules of evidence. *See id.* (citing *Taylor v. Illinois*, 484 U.S. 400, 410, 98 L. Ed. 2d 798 (1988) ("The accused does not have an unfettered Sixth Amendment right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.") (brackets omitted)). Indeed, only rarely has the Supreme Court "held that the right to present a complete defense [is] violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, __ U.S. __, __, 186 L. Ed. 2d 62, 66 (2013). Because we have determined that the trial court excluded Cloutier's testimony within the bounds of our rules of evidence, we hold that Defendant's constitutional right to present a defense was not violated. Defendant's second argument is therefore overruled.

*II. Character Evidence*

Defendant also argues that the trial court erred in excluding the testimony of Dr. Jerry Brittain, who addressed the decedent's alleged proclivity toward violence. We disagree.

 *A. Voir Dire*

At trial, Defendant called Dr. Brittain to the stand as a lay witness. The State objected, and the trial court conducted a *voir dire* examination.

On *voir dire*, Dr. Brittain discussed meetings he held with the decedent in June and July of 2011, approximately one year before the decedent's death. Referencing his notes from those meetings, Dr. Brittain testified that the decedent was angry and frustrated with many "areas" of his life. By his second meeting with the decedent, Dr. Brittain had begun "to surmise" that the decedent was dealing with "aggression," "thoughts of violence," and "conflict that he had with the people that were around him." In that meeting, Dr. Brittain and the decedent discussed "the violence," and Dr. Brittain stressed the need for the decedent to avoid being either the victim or the perpetrator in a confrontation. Dr. Brittain also referred to the decedent as "a very angry man," but noted that he was taking his medication, "ha[d] not perpetrated violence," and, in the decedent's words,

was "trying to not become angry and harm someone." When asked about the source of the decedent's anger, Dr. Brittain testified that it "permeated all of his life," but noted that the source was not specifically related to Defendant, who was not discussed during the meetings.

At the conclusion of *voir dire*, the trial court excluded Dr. Brittain's testimony in its entirety on relevance grounds and under Rules 403 and 404(a)(2) of the North Carolina Rules of Evidence.

*B. Legal Background and Analysis*

Defendant argues that the trial court erred in excluding Dr. Brittain's testimony, "[s]imply put, [because] a violent man is more likely to be the aggressor than a peaceable man." Defendant also argues that this error prevented him from offering important evidence in his defense and, thus, "denied him his constitutional right to present a defense." We are unpersuaded.

*(1) Rule 404(a)(2)*

Rule 404 provides, in pertinent part, that:

> (a) . . . Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

. . .

> (2) . . . Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor.

N.C. Gen. Stat. § 8C-1, Rule 404.

Character evidence is evidence of "[t]he peculiar qualities impressed by nature or by habit on the person, which distinguish him from others." *Bottoms v. Kent*, 48 N.C. (3 Jones) 154, 160 (1855). A person's character "can only be known indirectly . . . by inference from acts. A witness called to prove them, can only give the opinion which he has formed by his observations of the conduct of the person under particular circumstances . . . ." *Id.* As distinct from reputation, "character is what a man *is*" and "reputation is what others *say* he is." Kenneth S. Broun, 1 *Brandis & Broun on North Carolina Evidence* 253 (6th ed. 2004) (emphasis in original).

"Rule 404(a) is a general rule of exclusion, prohibiting the introduction of character evidence to prove that a person acted in conformity with that evidence of character." *State v. Bogle*, 324 N.C. 190, 201, 376 S.E.2d 745, 751 (1989). Such

evidence may be admitted, however, when testimony regarding a *pertinent character trait* of the victim (here, the decedent) is offered by the defendant in a criminal case. N.C. Gen. Stat. § 8C-1, Rule 404(a)(2). In cases where self-defense is at issue, evidence of a victim's violent or dangerous character may be admitted under Rule 404(a)(2) when "(1) such character was known to the accused, or (2) the [other] evidence of the crime is *all circumstantial* or the nature of the transaction is in doubt." *State v. Winfrey*, 298 N.C. 260, 262, 258 S.E.2d 346, 347 (1979) (emphasis added); *see also State v. Blackwell*, 162 N.C. 672, 78 S.E. 316 (1913) ("[Evidence] is . . . competent to show the character of the deceased as a violent and dangerous man when the [remaining] evidence is *wholly circumstantial* and the character of the encounter is in doubt.") (emphasis added). This is because the evidence of the victim's violent character "tends to shed *some light* upon who was the aggressor since a violent man is more likely to be the aggressor than is a peaceable man." *Winfrey*, 298 N.C. at 262, 258 S.E.2d at 348 (emphasis added).

In this case, the court excluded Dr. Brittain's testimony under Rule 404(a)(2) because the witness "didn't testify as to any trait or character. He was simply testifying as to a fact. . . . He . . . was merely reciting what the facts were

when the victim presented himself [during the meetings]." Defendant argues, however, that Dr. Brittain's testimony should have been admitted pursuant to *State v. Everett*, 178 N.C. App. 44, 630 S.E.2d 703 (2006), *affirmed*, 361 N.C. 217, 639 S.E.2d 442 (2007). In that case, the defendant, arguing that she killed the victim in self-defense, presented evidence that the victim had committed a separate violent act. *Id.* at 52, 630 S.E.2d at 708. The trial court excluded that testimony as irrelevant. *Id.* at 50, 630 S.E.2d at 707. We reversed the trial court's decision under *Winfrey* and Rule 404(a)(2) and held that the evidence of the violent act was relevant and admissible, in part, because it was known by the defendant. *Id.* Defendant argues under *Everett* that, "[w]ithout the testimony from Dr. Brittain, the jury was unable to understand how [the decedent] was the aggressor. This evidence established, through specific examples, that [the decedent] was a violent man and likely was the aggressor. The exclusion of this evidence by the trial court was error." We disagree.

Dr. Brittain's testimony — as the trial court noted in excluding it under Rule 404(a) — does not constitute evidence of the decedent's character for violence. When asked about his meetings with the decedent, Dr. Brittain testified to the fact

that the decedent was an angry person who had thoughts of violence. He did not, however, testify to his opinion that the decedent was, inherently, a man of violent character or even a violent person as distinguished from others. In fact, contrary to Defendant's argument on appeal, Dr. Brittain affirmed on cross-examination that "there was no evidence that [the decedent] was actually committing any acts of violence[.]" Rather, "[h]e was just generally frustrated at the system." Because Rule 404(a)(2) only allows testimony regarding a pertinent character trait, the trial court did not err in excluding Dr. Brittain's testimony as inadmissible on that basis.

To the extent that Dr. Brittain's testimony could be construed as character evidence, however, we note that this case is distinct from *Everett*. In *Everett*, the evidence of the victim's violent act fulfilled one of the *Winfrey* requirements — it was known by the defendant — and, therefore, increased the likelihood that the defendant acted out of self-defense. Dr. Brittain's testimony met neither requirement. First, it failed to show that Defendant was aware of any anger issues or the alleged violent nature of the decedent. Indeed, Dr. Brittain clearly stated that the source of the decedent's anger was *not*

Defendant and that Defendant was not even discussed. Second, there is ample direct evidence regarding the altercation between the decedent and Defendant. The altercation was recorded on Defendant's tape recorder and was the subject of eye-witness testimony. Such evidence is not circumstantial and, therefore, does not allow the trial court to admit the evidence under Rule 404(a)(2). Accordingly, Defendant's argument is overruled.

*(2) Rules 401, 402, and 403*

Defendant also argues that the trial court erred in excluding Dr. Brittain's testimony as to Defendant's character for violence because "[the decedent's alleged] violent character is relevant as it relates to whether [he] was the aggressor" and is not unfairly prejudicial under Rule 403 because "[i]ts only prejudice to the State was its relevance to the defense." This argument is without merit.

Rule 401 of the North Carolina Rules of Evidence states that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401. Rule 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of

the United States, by the Constitution of North Carolina, by Act of Congress, by Act of the General Assembly or by these rules. Evidence which is not relevant is not admissible." N.C. Gen. Stat. § 8C-1, Rule 402 (emphasis added). Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403. "We review a trial court's decision to exclude evidence under Rule 403 for abuse of discretion." *State v. Whaley*, 362 N.C. 156, 160, 655 S.E.2d 388, 390 (2008).

Because we have already determined that the trial court properly excluded Dr. Brittain's testimony as not admissible under Rule 404(a)(2), we need not address these alternative bases for exclusion. Nonetheless, we note that Defendant's argument does not provide any reason to believe that Judge Albright acted arbitrarily or was manifestly unreasonable in determining that "any probative value of this evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Defendant's argument is overruled.

### *(3) Constitutional Right to Present a Defense*

As a part of his preceding arguments, Defendant contends that the trial court's exclusion of Dr. Brittain's testimony requires a new trial because it violated his constitutional right to present witnesses in his own defense under Article VI of the United States Constitution and Article 1, Section 23 of the North Carolina Constitution. We disagree.

As we noted in section I(C)(2), the right to present a defense is not absolute and does not apply when a trial court properly deems evidence inadmissible under the rules of evidence. Because we have determined that Dr. Brittain's testimony was properly excluded by the trial court under Rule 404(a)(2), this argument is overruled.

NO ERROR.

Judges CALABRIA and ELMORE concur.