BRYANT, Judge.
 

 *199
 
 Where the proffered expert testimony would not provide insight to the trier of fact beyond the conclusions that jurors could readily draw from their ordinary experience, the trial court did not abuse its discretion in excluding the testimony. Where there was evidence that defendant was the aggressor, the trial court did not err in instructing the jury on the aggressor doctrine as it relates to self-defense. Where there was insufficient evidence to support restitution in the amount of $3,360.00 in funeral expenses to Ward's family, we vacate and remand this portion of the trial court's order.
 

 On 23 July 2014, Ronnie Williams was in the muffler shop that he ran on Bell Fork Road in Jacksonville, North Carolina, when he heard four gunshots. Williams testified that he could not recall the exact time of day he heard the gunshots, but that he believed it was in the afternoon. The first three shots were fired in rapid succession followed by a short pause before the fourth shot. Williams looked outside behind the shop and saw a man running from the area where the shots had been fired. A car pulled up, and the man got into the car. As gunfire was common in the area, Williams went back to work. Just before 7:00 p.m., Williams walked into the field behind his shop to retrieve a hoe he had left outside. He found a body and had his wife call the police.
 

 Around 7:00 p.m., the first officer responded to the scene. He discovered a male body with blood visible on his back and around the body. He also noticed a shell casing near the victim's head. The victim had been shot in the upper chest, shoulder, abdomen, right flank, and twice in the back. Later, more shell casings were found, all from a 9mm weapon.
 

 Jennifer Hankins arrived at the scene and related that she was the girlfriend of the deceased, Robert Ward. Ward, who was known to buy and sell drugs, had worked as an informant for one of the detectives who identified Ward as the victim at the scene and informed Hankins of the deceased's identity. Hankins told officers that at about 6:30 p.m. that day, Ward indicated he was going out with Antonio Best to rob a target, and as he did so, he put a 9mm pistol into the pocket of his waistband. Ward and Best hoped to steal as much as $20,000.00 from their target, defendant Corey Alexander Thomas. Hankins also recalled that Ward had put $80.00 in "flash money" in his pocket. Officers obtained an arrest warrant for Best, charging him with conspiring with Ward to commit robbery with a dangerous weapon.
 

 Meanwhile, during the afternoon of 23 July 2014, defendant had been to the Liberty Inn to visit Lia Cassell, his sometime-roommate and sexual partner and to whom he also sold
 
 *837
 
 heroin. Later, defendant called
 
 *200
 
 Cassell asking her to call him a cab but refusing to tell her where he was. Defendant sounded very panicky and said he had shot somebody.
 

 Ten to fifteen minutes after the phone call, defendant showed up at Cassell's motel room very disheveled, panicky, and with blood on him. Surveillance video from the Liberty Inn showed a Yellow Cab arrive at the rear of the motel around 7:26 p.m.
 

 Defendant went into the bathroom and cleaned up. He then told Cassell that he had shot someone multiple times and was sure the person was dead. Defendant told Cassell he "wanted to go on the run" and that he wanted Cassell to come with him. Cassell refused and told him she would only help him turn himself in. Defendant left, and Cassell went to the police, told them what she had heard, helped police identify the likely places to which defendant might have run, and allowed officers to search her motel room.
 

 Defendant was ultimately located and arrested in a motel parking lot in Havelock, North Carolina. The officer who took him into custody testified that defendant complained of a shoulder injury and had a .32-caliber Kel-Tec semi-automatic handgun concealed in his front pocket.
 

 On 6 June 2015, defendant was indicted by an Onslow County grand jury for first-degree murder. The case came on for trial during the 6 June 2016 session, the Honorable Ronald L. Stephens, Superior Court Judge presiding. Defendant testified at length about the events of 23 July 2014. Among other things, defendant testified that upon meeting Ward and Best, he knew he was being robbed. According to defendant, Ward struck defendant across the head with his pistol and, after a struggle, defendant got control of the gun and "three shots let off in succession: Pow! Pow! Pow!" while Ward was on his knees reaching for the gun. Defendant emptied Ward's pockets taking "everything that looked like it belonged to [defendant]."
 

 The trial court submitted the case to the jury on second-degree murder and voluntary manslaughter. Defendant was convicted of voluntary manslaughter and sentenced to an active term of imprisonment for sixty-five months minimum to ninety months maximum. Restitution in the amount of $3,360.00 was entered as a civil judgment to be paid as a condition of post-release supervision or work release, if applicable. Defendant appeals.
 

 _________________________
 

 On appeal, defendant argues the trial court erred (I) in excluding the testimony of a forensic psychologist about the phenomenon of "fight or
 
 *201
 
 flight"; (II) in overruling defendant's objection to an instruction that he would not be entitled to a claim of self-defense if he was the aggressor where no evidence supported such an instruction; and (III) by imposing $3,360.00 in restitution where this amount was not supported by the evidence.
 

 I
 

 Defendant argues the trial court erred in excluding the expert opinion testimony of a forensic psychologist about the phenomenon of "fight or flight" as it was relevant to defendant's defense to the charge of voluntary manslaughter. Specifically, defendant contends the trial court incorrectly ruled that this evidence was not relevant or reliable and that it would not assist the jury and that the trial court's exclusion of this testimony violated his constitutional rights. We disagree.
 

 In contending that the trial court's exclusion of this testimony violated his constitutional rights, defendant argues the standard of review on appeal should be
 
 de novo
 
 . However, this Court has previously addressed and rejected such an argument.
 
 See
 

 State v. McGrady
 
 (
 
 McGrady I
 
 ),
 
 232 N.C. App. 95
 
 , 105-06,
 
 753 S.E.2d 361
 
 , 369-70 (2014) (disagreeing with the defendant's contention that the exclusion of his witness's testimony under Rule 702 violated his constitutional right to present a defense under the Sixth Amendment of the United States Constitution and Article I, section 23 of the N.C. Constitution ),
 
 aff'd
 

 368 N.C. 880
 
 ,
 
 787 S.E.2d 1
 
 (2016) ("
 
 McGrady II
 
 ").
 
 [1]
 
 As such, we review for abuse of discretion.
 
 See
 

 infra
 
 .
 

 *838
 
 "[T]he trial judge is afforded wide latitude of discretion when making a determination about the admissibility of expert testimony."
 
 State v. Bullard
 
 ,
 
 312 N.C. 129
 
 , 140,
 
 322 S.E.2d 370
 
 , 376 (1984). "The trial court's decision regarding what expert testimony to admit will be reversed only for an abuse of discretion."
 
 State v. Alderson
 
 ,
 
 173 N.C. App. 344
 
 , 350,
 
 618 S.E.2d 844
 
 , 848 (2005) (citing
 
 State v. Holland
 
 ,
 
 150 N.C. App. 457
 
 , 461-62,
 
 566 S.E.2d 90
 
 , 93 (2002) ).
 

 In affirming this Court's opinion in
 
 McGrady II
 
 , our Supreme Court set forth the grounds on which an abuse of discretion may be found when a trial court admits or excludes expert testimony:
 

 The trial court then concludes, based on these findings, whether the proffered expert testimony meets
 
 *202
 
 Rule 702(a)'s requirements of qualification, relevance, and reliability. This ruling "will not be reversed on appeal absent a showing of abuse of discretion." And "[a] trial court may be reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision."
 
 State v. Riddick
 
 ,
 
 315 N.C. 749
 
 , 756,
 
 340 S.E.2d 55
 
 , 59 (1986). The standard of review remains the same whether the trial court has admitted or excluded the testimony-even when the exclusion of expert testimony results in summary judgment and thereby becomes "outcome determinative."
 

 368 N.C. at 893
 
 ,
 
 787 S.E.2d at 11
 
 (alteration in original) (internal citations omitted). "In addition, even if expert scientific testimony might be reliable in the abstract, to satisfy Rule 702(a)'s relevancy requirement, the trial court must assess 'whether that reasoning or methodology properly can be applied to the facts in issue.' "
 
 State v. Babich
 
 , --- N.C. App. ----, ----,
 
 797 S.E.2d 359
 
 , 362 (2017) (quoting
 
 Daubert v. Merrell Dow Pharm., Inc.
 
 ,
 
 509 U.S. 579
 
 , 593,
 
 113 S.Ct. 2786
 
 , 2796,
 
 125 L.Ed. 2d 469
 
 , 482 (1993) ). "This ensures that 'expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.' "
 

 Id.
 

 (quoting
 
 Daubert
 
 ,
 
 509 U.S. at 591
 
 ,
 
 113 S.Ct. at 2796
 
 ,
 
 125 L.Ed. 2d at
 
 481 ). "The Supreme Court in
 
 Daubert
 
 referred to this as the 'fit' test."
 

 Id.
 

 (citation omitted).
 

 Rule 702(a) states as follows:
 

 If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
 

 (1) The testimony is based upon sufficient facts or data.
 

 (2) The testimony is the product of reliable principles and methods.
 

 (3) The witness has applied the principles and methods reliably to the facts of the case.
 

 N.C. Gen. Stat. § 8C-1, Rule 702(a) (2015),
 
 amended by
 
 N.C. Sess. Laws 2017-212, § 5.3, eff. June 28, 2017. However,
 

 *203
 
 [w]hile "[ Rule] 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony ... is not only relevant, but reliable," "
 
 Daubert
 
 did not work a seachange [sic] over ... evidence law, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."
 

 State v. Hunt
 
 , --- N.C. App. ----, ----,
 
 792 S.E.2d 552
 
 , 560 (2016) (alterations in original) (internal citation omitted) (quoting Fed. R. Evid. 702 (2012) (Advisory Committee notes) ).
 

 In
 
 McGrady
 
 ,
 
 [2]
 
 the defendant appealed from his conviction for first-degree murder and argued the trial court abused its discretion in excluding the expert testimony offered by the defendant regarding the doctrine of "use of force,"
 
 McGrady I
 
 ,
 
 232 N.C. App. at 98
 
 ,
 
 753 S.E.2d at 365
 
 , and the sympathetic nervous system's "fight or flight" response,
 
 *839
 

 McGrady II
 
 ,
 
 368 N.C. at 894
 
 ,
 
 787 S.E.2d at 11
 
 ,
 
 [3]
 
 violating his right to present a defense. This Court disagreed, noting that the expert witness "was not even able to cite a single specific study, merely referring to the existence of studies and their authors generally[,]" "admitted that he knew nothing about the [relevant 'rate of error'] or how it related to his opinions[,]" "completely lacked medical credentials," and that the expert's testimony "was firmly within the realm of common knowledge and would not be helpful to the jury."
 
 McGrady I
 
 ,
 
 232 N.C. App. at 105
 
 ,
 
 753 S.E.2d at 369-70
 
 . Thus, this Court held that the trial court's decision to exclude his testimony "was well-reasoned, especially given the
 
 Daubert
 
 requirements invoked by amended Rule 702."
 
 Id.
 
 at 106,
 
 753 S.E.2d at 370
 
 .
 

 In
 
 McGrady II
 
 , the North Carolina Supreme Court noted the "[d]efendant testified at trial that he did not remember the number of shots that he fired" and "all of his attention was focused on the threat."
 
 368 N.C. at 896
 
 ,
 
 787 S.E.2d at 13
 
 . "[The expert's] testimony on stress responses was therefore intended to show that the state of [the] defendant's memory and [the] defendant's description of what he experienced were consistent with having perceived a threat to his life and the life of his son."
 

 Id.
 

 *204
 
 However,
 

 [t]he trial court excluded this portion of [the expert's] testimony because it concluded that he was not "qualified to talk about how something affects the sympathetic nervous system." [The expert] testified at voir dire that he was not a medical doctor but that he had studied "the basics" of the brain in general psychology courses in college. He also testified that he had read articles and been trained by medical doctors on how adrenalin e affects the body, had personally experienced perceptual narrowing, and had trained numerous police officers and civilians on how to deal with these stress responses.
 

 Though Rule 702(a) does not create an across-the-board requirement for academic training or credentials, it was not an abuse of discretion in this instance to require a witness who intended to testify about the functions of an organ system to have some formal medical training.
 

 Id.
 

 (internal citation omitted).
 

 As a result, the North Carolina Supreme Court affirmed this Court's opinion in
 
 McGrady II
 
 , stating that "because [the expert] lacked medical or scientific training[,]" "he was far less qualified to testify about the sympathetic nervous system."
 

 Id.
 

 As a result, "[
 
 i
 
 ]
 
 n
 
 [
 
 that
 
 ]
 
 context
 
 , it was not 'manifestly without reason' for the trial court to exclude [the expert's] testimony ...."
 

 Id.
 

 (emphasis added). In other words, the North Carolina Supreme Court determined that the proffered expert's testimony in
 
 McGrady
 
 was not improperly excluded where the expert in question-who intended to testify about human physiology specifically-"lacked medical or scientific training."
 

 Id.
 

 Like the excluded expert testimony at issue in
 
 McGrady
 
 , in the instant case, the excluded expert testimony focused on forensic psychologist Dr. Amy D. James's opinions as to "fight or flight response." Defendant argues the trial court applied
 
 McGrady
 
 in a "rote manner without carefully examining the proffered testimony and its scientific underpinning."
 

 Dr. James testified that she is licensed to practice as a psychologist in the State of North Carolina, and she has a bachelor's degree in psychology, a master's degree in clinical psychology, and a PhD in clinical psychology. She testified that she is employed in private practice, consulting in forensic and clinical psychological evaluations. Dr. James also testified that she has a specialization within "the field of forensic psychology, as well as police and public safety psychology."
 

 *205
 
 During her
 
 voir dire
 
 , Dr. James testified in relevant part about the "fight or flight response of the sympathetic nervous system," the principles and methods used,
 
 *840
 
 the facts or data upon which they were based, and how she applied these principles in her work as follows:
 

 I reviewed the processes and procedures by which these research articles were published, to include experiments on animals dating back to 1915, 1920, by Walter Cannon, to admit analyses that were conducted just in 2011, to summarize what the plasma level changes of stress hormones were following stressful events. I reviewed post-event research on victims of crime and on military personnel and law enforcement officers who responded to threats. Situations where they looked at the physiological changes during that time. And applied them to the changes that occurred in animals. There wasn't any research available where we subjected humans to acute stressful situations. ...
 

 ....
 

 Q.... And what studies or experiments have been done to establish that this fight or flight response is an accepted theory or doctrine in the field of psychology?
 

 A. Walter Cannon, who was a physiologist at Harvard University ... subjected live animals to stressful situations and measured empirically their response to that. That is where the fight or flight research began. Since then, an individual named ... Selye ... applied it to humans. Walter Cannon generalized it to humans.
 

 In the past 30 to 40 years, the fight or flight response has been studied more in the military communities. It has been studied on through the Center for Violence Policy through multiple schools. ...
 

 So the research has been ongoing for approximately 90 years. There are hundreds of studies in that area. There are books on that. There's books by Mr. Grossman who has published on combat and on killing. There are people who study only that field of science.
 

 Q. Are there any variables that would make the straightforward application of the fight or flight response of the sympathetic nervous system unreliable? I mean,
 
 *206
 
 are there things that-yeah-inaccurate? Are there things that would make the application of this doctrine unreliable? Any variables you can think of?
 

 A. To this specific case or to any case?
 

 Q. In general.
 

 A. In general. There would be situations in which someone may, you know, call me up and say, Hey, I think this is what's going on. But when I reviewed that individual's case record and their history, I would exclude it.
 

 ....
 

 A.... The fight or flight response is only activated if the person perceived a situation as threatful [sic]. And what one person perceives as a threat is different than what another person perceives as a threat. And if someone has been trained to exclude particular situations as a threat and then they wanted to say their fight or flight response kicked in in response to a threat they had trained to push through, I would question whether or not it could be applied.
 

 When asked if she had an opinion as to whether defendant "used more force than reasonably appeared to be necessary" on the date of the shooting, she responded that she believed defendant's "perception was that he did what he needed to do to eliminate the threat."
 

 In excluding Dr. James's expert witness testimony, the trial court made the following findings:
 

 THE COURT: ... The Court is going to make the following findings in regards to the objection of the State, both in the motion in
 
 limine
 
 and in the trial itself in regard to certain aspects of this witness'[s] Dr. James, testimony.
 

 The Court rules that Dr. Amy D. James'[s] testimony regarding the fight or flight response doctrine and the sympathetic nervous system and her opinion of the defendant's response based on that doctrine, or those doctrines, does not meet the standard of admissibility set forth in Rule 702(a) of the North Carolina Rules of Evidence. The Court determines that Dr. James'[s] testimony, to the extent that it would be considered scientific testimony or evidence, is not relevant or reliable.
 

 *207
 
 The
 
 *841
 
 Court determines that Dr. James'[s] testimony is not based upon sufficient facts or data, number one; number two, nor is the testimony the product of reliable principles and methods; and number three, nor has the witness applied the principles and method reliably to the facts of this case.
 

 The Court further find [sic] that the expert's proffered method of proof is not scientifically reliable as an area for expert testimony nor is the expert's testimony relevant in this case.
 

 The Court further finds that Dr. James-Dr. James'[s] testimony is not based on scientific, technical, or other specialized knowledge that will assist the trier of fact, the jury here, to better understand the evidence or to determine a fact in issue. The testimony does not meet the minimum standard for logical relevance required by Rule 401 of the Rules of Evidence. Dr. James'[s] testimony as an expert witness does not provide insight beyond the conclusions that jurors can readily draw from their own ordinary experiences in their own lives.
 

 Therefore, the Court determines that Dr. James'[s] testimony does not meet the three-prong reliability test mandated by the North Carolina Supreme Court in
 
 State v. McGrady
 
 . And discussed in that opinion and earlier opinions is the
 
 Daubert
 
 decision, which requires that testimony most be, one, based upon sufficient facts or data; number two, it must be the product of reliable principles and methods; and number three, the witness must have applied the principles and methods reliably to the facts of the case. The Court determines that Dr. James'[s] testimony would not assist the jury as required by Rule 702(a) of the North Carolina Rules of Evidence, and is therefore inadmissible as to an expert opinion in this area.
 

 "As with other findings of fact, these findings will be binding on appeal unless there is no evidence to support them."
 
 McGrady II
 
 ,
 
 368 N.C. at 893
 
 ,
 
 787 S.E.2d at
 
 11 (citing
 
 State v. King
 
 ,
 
 366 N.C 68
 
 , 75,
 
 733 S.E.2d 535
 
 , 540 (2012) ).
 

 After a thorough review, we cannot say the trial court abused its discretion when it excluded Dr. James's proffered testimony regarding the "fight or flight" response. The expert testimony excluded in
 
 McGrady
 

 *208
 
 was excluded largely because the expert "lacked medical or scientific training[,]"
 
 Id.
 
 at 896,
 
 787 S.E.2d at 13
 
 , and while Dr. James held several degrees, including a PhD in psychology, as well as a license to practice psychology in North Carolina, these were not medical or scientific degrees. Therefore, the trial court determined that her testimony
 

 [was] not based on scientific, technical, or other specialized knowledge that [would] assist the trier of fact, the jury here, to better understand the evidence or to determine a fact in issue. ... Dr. James'[s] testimony as an expert witness does not
 
 provide insight beyond the conclusions that jurors can readily draw from their own ordinary experiences in their own lives
 
 .
 

 (Emphasis added). The trial court acted well within its discretion to make this determination.
 
 See
 

 State v. Campbell
 
 ,
 
 149 Conn.App. 405
 
 ,
 
 88 A.3d 1258
 
 , 1276-77 (2014) (noting that the trial court did not abuse its discretion when it excluded the proffered testimony of an expert witness regarding "fight or flight" responses where "the jury would likely be aware of such fight or flight responses as a result of their own experiences").
 

 In order to "assist the trier of fact," N.C. R. Evid. 702(a), expert testimony must provide insight beyond the conclusions that jurors can readily draw from their ordinary experience. An area of inquiry need not be completely incomprehensible to lay jurors without expert assistance before expert testimony becomes admissible. To be helpful, though, that testimony must do more than invite the jury to "substitute[e] [the expert's] judgment of the meaning of the facts of the case" for its own.
 

 McGrady II
 
 ,
 
 368 N.C. at 889
 
 ,
 
 787 S.E.2d at 8
 
 (alterations in original) (citation omitted) (quoting
 
 Burell v. Sparkkles Reconstr. Co.
 
 ,
 
 189 N.C. App. 104
 
 , 114,
 
 657 S.E.2d 712
 
 , 719 (2008) ).
 

 Dr. James's testimony was not proffered in order for her to explain, for example, a highly technical and scientific issue in simpler terms for the jury. To the contrary, her
 
 *842
 
 testimony appeared to be proffered in order to cast a sheen of technical and scientific methodology onto a concept of which a lay person (and jury member) would probably already be aware.
 
 See
 

 Campbell
 
 ,
 
 88 A.3d at 1277
 
 . In other words, we conclude that Dr. James's proffered expert testimony did not "provide insight beyond the conclusions that jurors can readily draw from their ordinary experience."
 
 McGrady II
 
 ,
 
 368 N.C. at 889
 
 ,
 
 787 S.E.2d at 8
 
 .
 

 *209
 
 Under the abuse of discretion standard, our role is not to surmise whether we would have disagreed with the trial court,
 
 see
 

 State v. Lasiter
 
 ,
 
 361 N.C. 299
 
 , 302,
 
 643 S.E.2d 909
 
 , 911 (2007), but instead to decide whether the trial court's ruling was "so arbitrary that it could not have been the result of a reasoned decision,"
 
 White v. White
 
 ,
 
 312 N.C. 770
 
 , 777,
 
 324 S.E.2d 829
 
 , 833 (1985).
 

 Id.
 

 at 899
 
 ,
 
 787 S.E.2d at 15
 
 . The trial court did not abuse its discretion in excluding defendant's proffered expert testimony regarding the "fight or flight" response, and defendant's argument is overruled.
 

 II
 

 Defendant next argues the trial court committed reversible error by overruling defendant's objection to an instruction that he would not be entitled to a claim of self-defense if he was the aggressor where, defendant contends, no evidence supported such an instruction. We disagree.
 

 "Assignments of error challenging the trial court's decisions regarding jury instructions are reviewed
 
 de novo
 
 by this Court."
 
 State v. Osorio
 
 ,
 
 196 N.C. App. 458
 
 , 466,
 
 675 S.E.2d 144
 
 , 149 (2009) (citations omitted).
 

 [T]he right of self-defense is only available to a person who is without fault, and if a person voluntarily, that is aggressively and willingly, enters into a fight, he cannot invoke the doctrine of self-defense unless he abandons the fight, withdraws from it and gives notice to his adversary that he has done so.
 

 State v. Marsh
 
 ,
 
 293 N.C. 353
 
 , 354,
 
 237 S.E.2d 745
 
 , 747 (1977) (citations omitted). "When there is no evidence that a defendant was the initial aggressor, it is reversible error for the trial court to instruct the jury on the aggressor doctrine of self-defense."
 
 State v. Juarez
 
 ,
 
 369 N.C. 351
 
 , 358,
 
 794 S.E.2d 293
 
 , 300 (2016) (citations omitted);
 
 see
 

 State v. Jenkins
 
 ,
 
 202 N.C. App. 291
 
 , 298-99,
 
 688 S.E.2d 101
 
 , 106-07 (2010) (ordering a new trial and holding the trial court erred in instructing the jury that the defendant could not avail himself of the benefit of self-defense if he was the aggressor where the victim had been argumentative, "initiated the fray," ignored the defendant's request that he leave, and tackled and choked the defendant before the defendant reached for a nearby gun and fired one time at the victim).
 

 "Broadly speaking, the defendant can be considered the aggressor when [ ]he 'aggressively and willingly enters into a fight without legal excuse or provocation.' "
 

 *210
 

 State v. Vaughn
 
 ,
 
 227 N.C. App. 198
 
 , 202,
 
 742 S.E.2d 276
 
 , 279 (2013) (quoting
 
 State v. Wynn
 
 ,
 
 278 N.C. 513
 
 , 519,
 
 180 S.E.2d 135
 
 , 139 (1971) );
 
 see
 

 id.
 

 at 203-04
 
 ,
 
 742 S.E.2d at 280
 
 (holding that evidence presented at trial was insufficient to support the instruction that the defendant would lose the benefit of self-defense if she were the aggressor where she fled an altercation with the victim, then armed herself and left a place of relative safety (a vehicle), but where there was no evidence that she brought on the original difficulty "or intended to continue the altercation"). Additionally, where evidence presented at trial "reflects that the victim was shot from the side and from behind," this may "further support[ ] the inference that [the] defendant shot at the victim only after the victim had quit the argument and was trying to leave."
 
 State v. Cannon
 
 ,
 
 341 N.C. 79
 
 , 83,
 
 459 S.E.2d 238
 
 , 241 (1995).
 

 In the instant case, defendant testified that he had a pocketknife with him at the time of the incident, and that when it fell to the ground, he "immediately picked it up ... not[ing], 'This is my joint.' " Defendant testified he said that "in order to keep the robbers at bay. Like having an ADT sign in front of your house without having the service. It's just in order to keep them at bay." Defendant clarified that when he said "This is my joint," he meant he was referring to
 
 *843
 
 the pocketknife as a pistol. Defendant testified that Ward "possibly assumed I had a pistol." Thus, from defendant's own testimony, it was possible for the jury to infer that defendant was the initial aggressor based on his intent to trick Ward into thinking he had a gun. Further, like the victim in
 
 Cannon
 
 , the victim in the instant case was shot twice in the back, which indicates either that defendant continued to be the aggressor, or shot the victim in the back during what he contended was self-defense.
 
 See
 

 id.
 
 at 83,
 
 459 S.E.2d at 241
 
 . As a result, based "[o]n the evidence before it, the trial court properly allowed the triers of fact to determine [whether or not] [the] defendant was the aggressor."
 
 See
 
 id.
 

 (citing
 
 State v. Terry
 
 ,
 
 329 N.C. 191
 
 , 199,
 
 404 S.E.2d 658
 
 , 663-64 (1991) ). The trial court did not err in instructing the jury based on the aggressor doctrine. Defendant's argument is overruled.
 

 III
 

 Lastly, defendant contends there was insufficient evidence to support restitution in the amount of $3,360.00 in funeral expenses to Ward's family. Because no receipts for the funeral costs were presented to the trial court in support of the restitution worksheet, a point the State concedes, we agree with defendant that this amount was not supported by the evidence introduced at the sentencing hearing.
 

 *211
 
 "[T]he amount of restitution recommended by the trial court must be supported by evidence adduced at trial or at sentencing."
 
 State v. Moore
 
 ,
 
 365 N.C. 283
 
 , 285,
 
 715 S.E.2d 847
 
 , 849 (2011) (quoting
 
 State v. Wilson
 
 ,
 
 340 N.C. 720
 
 , 726,
 
 459 S.E.2d 192
 
 , 196 (1995) ). This Court "has repeatedly held that 'a restitution worksheet, unsupported by testimony or documentation, is insufficient to support an order of restitution.' "
 

 Id.
 

 (quoting
 
 State v. Mauer
 
 ,
 
 202 N.C. App. 546
 
 , 552,
 
 688 S.E.2d 774
 
 , 778 (2010) ).
 

 In the instant case, no evidence-documentary or testimonial-supports the restitution ordered. All that exists in this record is the restitution worksheet, which is insufficient to support a restitution order. In such a case, the proper remedy is to "vacate the trial court's restitution order and remand for rehearing on the issue."
 
 Mauer
 
 , 202 N.C. App. at 552, 688 S.E.2d at 778 ;
 
 see also
 

 Moore
 
 ,
 
 365 N.C. at 286
 
 ,
 
 715 S.E.2d at 850
 
 . Accordingly, we vacate the restitution order and remand for rehearing on this issue.
 

 NO ERROR IN PART; VACATED AND REMANDED IN PART.
 

 Judges BERGER and MURPHY concur.
 

 [1]
 

 The Supreme Court of North Carolina handed down its decision in
 
 McGrady II
 
 on 10 June 2016, on the fifth day of trial in the instant case.
 
 State v. McGrady
 
 ("
 
 McGrady II
 
 "),
 
 368 N.C. 880
 
 , 880,
 
 787 S.E.2d 1
 
 , 1 (2016).
 

 [2]
 

 We refer to both
 
 McGrady I
 
 and
 
 McGrady II
 
 collectively as "
 
 McGrady
 
 ."
 

 [3]
 

 McGrady I
 
 referred more generally to the proffered expert's testimony as "Expert Witness Testimony on Use of Force,"
 
 State v. McGrady
 
 ("
 
 McGrady I
 
 "),
 
 232 N.C. App. 95
 
 , 98,
 
 753 S.E.2d 361
 
 , 365 (2014), whereas
 
 McGrady II
 
 addressed the more specific aspects of the proffered witness's testimony, including the expert's intention to testify about the "the sympathetic nervous system's 'fight or flight' response[.]"
 
 368 N.C. at 894
 
 ,
 
 787 S.E.2d at 11
 
 .