IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-597

Filed 19 February 2025

New Hanover County, No. 15CRS51090

STATE OF NORTH CAROLINA

v.

TYLER DEION GREENFIELD, Defendant.

Appeal by defendant from judgment entered 17 June 2022 by Judge Thomas R. Wilson in Superior Court, New Hanover County. Heard in the Court of Appeals 2 April 2024.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Teresa M. Postell, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Kathryn L. VandenBerg, for defendant-appellant.*

STROUD, Judge.

Defendant appeals the judgment convicting him of first-degree murder. Defendant contends he is entitled to a new trial since the trial court's jury instructions allowed the jury to convict him of first-degree murder under the felony murder rule without finding the required intent. Defendant also argues the trial court improperly allowed the State to contend a robbery had occurred when he was acquitted of robbery in a previous trial; the trial court improperly excluded evidence of the victim's "prior convictions, gang affiliation, 'Thug' tattoo, and possession of assault rifles[;]" and the trial court committed plain error in not intervening during

the State's allegedly improper closing arguments.  For the following reasons, our review discerns, and we conclude there was no error.

## I.    Background

The State and Defendant each presented evidence at trial depicting different versions of events.  However, it is undisputed that Defendant and a friend went to Jon and Beth's[1] apartment ("the Apartment") on 2 February 2015 to buy marijuana from Jon.  After Defendant and his friend arrived at the Apartment, an altercation began involving at least three handguns.  The State and Defendant differ as to what had occurred in the Apartment once Defendant and his friend arrived.

Beth testified on behalf of the State that she knew Jon sold marijuana and Defendant contacted Jon on the night of 2 February 2015 to buy marijuana from him, but she had told Jon she did not want Defendant coming to the Apartment to buy it, so if Jon was going to sell the marijuana to Defendant, it needed to be somewhere other than at the Apartment.  But after Beth went to sleep, she was awakened by voices in the living room.  Beth testified she heard Defendant and Jon speaking, and "it sounded like [Defendant] was getting aggressive, and [Jon's] . . . voice started to become very . . . high-pitched and scared."  Beth stated she had a hard time making out what exactly was being said, but she heard Defendant "say something to the effect of, [w]here's the money? Where's the guns?" and Jon responded "[w]hat money? I don't

---

[1] We use pseudonyms to identify the victims in this case.

have any money."

At this point, Beth got out of bed to see what was happening in the living room, and she saw Jon "with his hands up . . . at his waist, and . . . [Defendant] had him at gunpoint." Beth saw a gun in the bedroom and grabbed the gun; Defendant's friend came into the bedroom with a bag asking for the money, but was "caught off guard" when he realized Beth had a gun so he "turned around and walked back out of the doorway[.]" Beth then heard Defendant say "something to the effect of, [b]ring the gun out here, or I'm going to shoot him right in the head." Beth put the gun down on a table in the living room and Defendant's friend picked it up. After putting the gun down, Beth moved and was standing in front of Jon until Jon started "trying to slide [Beth] from in front of him[.]" Beth "started hearing . . . gunfire . . . closed [her] eyes," and "could feel pain on the side of [her] face and [she] could smell gunpowder . . . and burning flesh," at which point she "blacked out."

Beth testified Defendant was the person who had pulled the trigger. Beth then woke back up and saw "blood everywhere[;]" Beth saw Jon swaying and fall to the floor with blood pooling underneath him. Beth started screaming, tried to go to a neighbor's apartment for help, and called 911. Jon died as a result of the gunshots. Beth was shot through her left arm, under her ear, and on top of her head. Beth's injuries took about a year to heal since her gunshot wounds got infected and is permanently scarred.

On the other hand, Defendant testified in his defense and gave a much

different version of events than Beth. Defendant stated while he, his friend, and Jon were in Jon's living room, he "made a decision, a dumb decision, to pick up the gun that was laying on the table." After picking up the gun, Defendant testified Jon "recognized this, and [stood] up, and [Jon] had a problem with it" but before Defendant could give the gun back to Jon or put it down, he heard his friend say "[s]he got a gun" at which point he "point[ed] the gun." Defendant stated he thought he was "about to die" since Beth was pointing a gun at him. Defendant pointed the gun at Beth and then pointed the gun at Jon "like, [p]ut the gun down, or I'm going to shoot him. . . . I'm going to shoot him in the head." Then, Defendant stated Jon pulled a gun out, shot Defendant, and "[o]nce [he] felt [him]self get hit, [he] pulled the trigger on that gun as many times as [he] could[.]"

Defendant essentially testified he did not bring a gun when he went to the Apartment to buy marijuana and he had used a gun he found "laying on the table" there to shoot Jon and Beth in self-defense after they had pointed guns at him. At least, this was the version of events Defendant testified to at trial. The evidence also showed Defendant changed his story at least eight times in his interviews with law enforcement before giving his final version of events. He testified at trial that he had lied in the interviews. After being asked on cross-examination "[e]very time [law enforcement] pokes holes in your story, you change it, correct[,]" Defendant answered "yes[.]"

An audio recording of the altercation was captured after Defendant

accidentally called Jon's cellphone and left a voicemail recording of the events. Again, Defendant and the State's witnesses gave different interpretations of this voicemail. The State's witnesses argued Defendant said "where's the money" while Defendant argues Jon was the one saying "where's the money" as part of the drug transaction. In response, a voice is heard saying "I ain't got no money" which Defendant contends was his friend speaking and Beth states it was Jon speaking. There is no dispute the voicemail captured Defendant saying he was going to shoot Jon in the head if Beth did not put the gun down.

On 26 May 2015, Defendant was indicted for first-degree murder, attempted first-degree murder, attempted robbery with a dangerous weapon, and assault with a deadly weapon with intent to kill inflicting serious injury ("AWDWIKISI"). The State filed superseding indictments for the same charges on 31 October 2016. The case was tried in February 2017 and Defendant was convicted of all charges except attempted robbery and attempted first-degree murder; he appealed and was granted a new trial by our Supreme Court on 25 September 2020 as "the trial court erred by failing to give [D]efendant's proposed instructions on self-defense and transferred intent for the assault charge[.]" *State v. Greenfield*, 375 N.C. 434, 447, 847 S.E.2d 749, 758-59 (2020).

Defendant's retrial was initially set to begin in August 2021 before Judge Tiffany Powers. Before the retrial, the State filed a motion on 30 July 2021 "to prevent the [d]efense from making reference to victim [Jon's] prior criminal

convictions, gang ties, and 'Thug' tattoo located across the victim's upper abdomen[,]" and "to preclude the [d]efense from making reference to or admitting into evidence any of the firearms found at [Jon's] residence . . . not capable of firing the casings or projectiles recovered [from] the residence." On 16 August 2021, Judge Powers entered orders excluding evidence of Jon's past criminal convictions, evidence of Jon's gang affiliation and membership, evidence of the "Thug" tattoo on Jon's abdomen, and evidence of the firearms not capable of being used in the shooting.

Defendant also filed a motion *in limine* on 2 August 2021 "to preclude the Prosecutor or any witnesses from making reference to or admitting into evidence any statements concerning an armed robbery" since Defendant was acquitted of attempted robbery in his first trial. Judge Powers denied Defendant's motion on 16 August 2021. Defendant's retrial before Judge Powers ended in mistrial due to the COVID-19 pandemic. The trial court in Defendant's June 2022 trial adopted the "previous orders from [Judge] Powers from August 16th of 2021" which included the ruling on Defendant's motion.

The trial court, in accord with our Supreme Court's holding in *Greenfield*, 375 N.C. 434, 847 S.E.2d 749, instructed the jury on self-defense. The trial court also instructed the jury on first-degree felony murder with the underlying felony being AWDWIKISI. Because Defendant was acquitted of attempted robbery in his first trial, robbery was not used as the underlying felony for the first-degree felony murder charge. While the defense did not request a jury instruction on transferred intent for

purposes of the felony murder charge during the charge conference, after the jury charge was given, the defense requested the trial judge give the following instruction on transferred intent:

> In order for you to find . . . [D]efendant guilty of first degree felony murder, you would need to find that the decedent, [Jon], was killed as a result of . . . [D]efendant's felonious assault on [Beth]. If you so find that the - - that [Jon] died as a result of . . . [D]efendant's intentional killing of [Jon], you would be required to find him not guilty of first degree felony murder.

The State objected to this proposed instruction as untimely since it was not first requested at the charge conference and was inaccurate. The trial judge denied the request to use the proposed instruction.

On or about 17 June 2022, the jury returned a verdict of guilty of first-degree murder of Jon under the felony murder rule with the underlying felony being AWDWIKISI of Beth and guilty of AWDWIKISI of Beth. The trial court entered judgment on or about 17 June 2022 arresting judgment on the AWDWIKISI charge of Beth and sentencing Defendant to life imprisonment without the possibility of parole. Defendant entered oral notice of appeal in open court.

## II.  Jury Instructions

Defendant first argues "a new trial is required because the court's instructions permitted the jury to find [Defendant] guilty of felony murder without the requisite intent." (Capitalization altered). Specifically, Defendant argues "[t]he instructions that were given improperly allowed the jury to find felony murder even if it concluded

that [Defendant] was aiming for [Jon] and only accidentally shot [Beth]."

## A. Standard of Review

Defendant argues this Court should review this issue *de novo* since he made a request to the trial court for the proposed jury instructions. The instruction was not requested during the charge conference but was requested after the trial court read the instructions to the jury and before the jury started deliberations. While the State concedes "'[*d*]*e novo*'" review is the correct standard when the request was timely[,]" the State contends Defendant "concedes it was not." The State argues "Defendant is not entitled to either *de novo* or plain error review of any instructional issue because he failed to timely object to the instructions and failed to allege and argue plain error in his principal brief." In his reply brief, Defendant contends he did not concede the request was untimely, and states "[t]he correct standard of review is de novo because trial courts must instruct on substantial and essential features of a case, even absent any specific request by" Defendant. Both sides agree that since Defendant submitted the proposed instruction after the trial judge had read the other instructions to the jury, our standard of review would be abuse of discretion if we determine the standard should not be *de novo*.

"Trial courts have a duty to instruct the jury on all substantial features of the case arising from the evidence and must properly instruct the jury as to all essential elements of the offense charged." *State v. Harper*, 285 N.C. App. 507, 518, 877 S.E.2d 771, 781 (2022) (citation and quotation marks omitted).

Rule 10(a)(1) of the North Carolina Rules of Appellate Procedure states the general rule that "to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make" and must "obtain a ruling upon the party's request, objection, or motion." Rule 10(a)(2) specifically addresses challenges to jury instructions and provides that:

> A party may not make any portion of the jury charge or omission therefrom the basis of an issue presented on appeal unless the party objects *thereto before the jury retires to consider its verdict,* stating distinctly that to which objection is made and the grounds of the objection; provided that opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of any party, out of the presence of the jury.

. . . .

Rule 21 [of the General Rules of Practice] also requires that:

> At the conclusion of the charge and *before the jury begins its deliberations,* and out of the hearing, or upon request, out of the presence of the jury, counsel shall be given the opportunity to object on the record to any portion of the charge, or omission therefrom, stating distinctly that to which he objects and the grounds of his objection.

*Geoscience Grp., Inc. v. Waters Const. Co., Inc.*, 234 N.C. App. 680, 686-87, 759 S.E.2d 696, 700-01 (2014) (emphasis added).

Here, while Defendant did not request this jury instruction at the charge conference, once the trial judge read the instructions to the jury, and before the jury started deliberations, Defendant requested an instruction on intent. The transcript shows counsel for Defendant and the State approached the bench in an off-the-record

bench conference after the instructions were read, then the trial judge instructed the jury to select its foreperson, stating:

> After reaching the jury room, your first order of business is to select your foreperson. You may begin your deliberations when the bailiff delivers the verdict forms to you. Your foreperson should lead the deliberations. When you have unanimously agreed upon a verdict as to each charge and are ready to announce them, your foreperson should record your verdicts, sign and date the verdict forms, and notify the bailiff by knocking on the jury room door. You will be returned to the courtroom and your verdict will be announced.

Then, after further discussing courtroom procedure with the remaining alternate jurors, the trial judge released the alternates and stated "[o]ur 12 jurors have left to elect their foreperson. Anything regarding - - before we address [Defendant's counsel], as to additional instructions, anything on the instructions as issued?" The State then asked for a brief clarification before Defendant's counsel requested the proposed instruction. Thus, the record shows the jury had retired to the jury room but had not yet selected the foreperson, so they had not yet begun deliberations. The trial court instructed the jury and followed the procedure as laid out in North Carolina Pattern Jury Instruction 101.35. *See* N.C.P.I. – Crim. 101.35.

Defendant timely requested the additional jury instruction before the jury began deliberations, in accord with our Rules of Appellate Procedure and Rules of General Practice. *Geoscience Grp., Inc.*, 234 N.C. App. at 686-87, 759 S.E.2d at 700-01. Thus, we conclude Defendant made a timely objection to the jury instructions

and we review his challenge *de novo*. *See id.* ("When a challenge to the trial court's instructions to the jury raises a legal question, it is subject to review *de novo*." (citation omitted)).

## B. Proposed Jury Instruction

Defendant argues the trial court's denial to give the proposed instruction was error since "[u]nder the merger doctrine, where a defendant assaults and kills a single victim, that assault cannot be the underlying felony to support first degree felony murder." Defendant recognizes "[o]rdinarily, if there are two assault victims, the intentional assault of one victim may be used to support a felony murder charge of the second victim" but contends "evidence supported the conclusion that [Defendant] intended to shoot [Jon] and only hit [Beth] by mistake" and thus "[u]nder the merger doctrine, assault of [Beth], by transferred intent, was not a permissible basis for felony murder of [Jon]."

> This Court reviews jury instructions contextually and in its entirety. The charge will be held sufficient if it presents the law of the case in such manner as to leave no reasonable cause to believe the jury was misled or misinformed. It is not enough for the appealing party to show that error occurred in the jury instructions; rather, it must be demonstrated that such error was likely, in light of the entire charge, to mislead the jury.

*State v. Clagon*, 279 N.C. App. 425, 433, 865 S.E.2d 343, 348 (2021) (citation omitted).

Felony murder is "a murder . . . which shall be committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping,

burglary, or other felony committed or attempted with the use of a deadly weapon[.]"

N.C. Gen. Stat. § 14-17(a) (2023). Our Supreme Court has noted that

> [a]lthough this Court has expressly disavowed the so-called "merger doctrine" in felony murder cases involving a felonious assault on one victim that results in the death of another victim, cases involving a single assault victim who dies of his injuries have never been similarly constrained. In such cases, the assault on the victim cannot be used as an underlying felony for purposes of the felony murder rule.

*State v. Carroll*, 356 N.C. 526, 535, 573 S.E.2d 899, 906 (2002) (citation omitted).

Here, the trial court gave an instruction as to transferred intent, stating "[i]f . . . [D]efendant intended to harm one person but instead harmed a different person, the legal effect would be the same as if . . . [D]efendant had harmed the intended victim." Then, as to felony murder, the trial court instructed:

> [D]efendant has been charged with the first degree murder of [Jon] in perpetration of a felony. Under the law and the evidence in this case, it is your duty to return one of the following verdicts: Guilty of first-degree murder in perpetration of one of the described felonies against [Beth] if perpetration of one of those felonies proximately caused the death of [Jon]; guilty of second degree murder of [Jon]; guilty of voluntary manslaughter of [Jon]; or not guilty.
>
> First degree murder under the first degree felony murder rule is the killing of a human being in the perpetration of the assault with a deadly weapon with intent to kill inflicting serious injury of an individual other than the deceased, or assault with a deadly weapon inflicting serious injury of an individual other than the deceased, or assault with a deadly weapon with intent to kill with a deadly weapon of a victim other than the deceased. . . .

For you to find . . . [D]efendant guilty of first degree murder in perpetration of a felony, the State must prove four things beyond a reasonable doubt. First: That . . . [D]efendant, either acting by himself or acting together with other persons, committed the crime of assault with a deadly weapon with intent to kill inflicting serious injury of [Beth], or assault with a deadly weapon inflicting serious injury of [Beth], or assault with a deadly weapon with intent to kill [Beth], and . . . [D]efendant had intent to commit the crime of assault with a deadly weapon with intent to kill inflicting serious injury of [Beth], or assault with a deadly weapon inflicting serious injury of [Beth], or assault with a deadly weapon with intent to kill [Beth]. Intent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred. You arrive at the intent of a person by such just and reasonable deductions from the circumstances proven as a reasonably prudent person would ordinarily draw therefrom.

Second: That while committing, either by himself or acting together with other persons, the crime of assault with a deadly weapon with intent to kill inflicting serious injury of [Beth], or assault with a deadly weapon inflicting serious injury of [Beth], or assault with a deadly weapon with intent to kill [Beth], . . . [D]efendant, either acting by himself or acting together with other persons, killed [Jon] with a deadly weapon.

Third: That . . . [D]efendant, either acting by himself or acting together with other persons, committed an act that was a approximate (sic) cause of [Jon's] death. A approximate (sic) cause is a real cause, a cause without which [Jon's] death would not have occurred.

And fourth: That the assault with a deadly weapon with intent to kill inflicting serious injury of [Beth], or assault with a deadly weapon inflicting serious injury of [Beth], or assault with a deadly weapon with intent to kill [Beth] was committed with the use of a deadly weapon. A firearm is a deadly weapon.

Thus, the trial court gave correct instructions on transferred intent and felony murder, and Defendant does not contend these instructions are erroneous. Defendant instead argues that under this "convoluted theory" that Defendant "had some independent reason to shoot and harm [Beth], and in the course of committing that felony, . . . shot [Jon] too[,]" "the instructions that were given improperly allowed the jury to find felony murder even if it concluded that [Defendant] was aiming for [Jon] and only accidentally shot [Beth]."

However, this is not a case where the assault of a single victim resulted in the death of the same single victim; instead, Beth and Jon were both shot and Jon died as a result of his wounds. As stated in *Carroll*, the assault with a deadly weapon of one victim can be a basis for felony murder of a separate victim. *See id.* As the State notes, "[h]ere, there are . . . multiple assaults, multiple victims, multiple injuries and multiple crimes." The trial judge gave an instruction on transferred intent and then gave specific instructions as to felony murder. These instructions stated that to find Defendant guilty of felony murder, the jury would have to find Defendant intentionally committed one of the enumerated types of assault on Beth; that while committing the assault on Beth, Jon was shot and killed as a result; and that the act was a proximate cause of Jon's death. While Defendant may disagree with the jury's interpretation of the evidence, after reviewing the instructions "contextually and in [their] entirety[,]" the instructions "present[ ] the law of the case in such manner as to leave no reasonable cause to believe the jury was misled or misinformed." *Clagon*,

279 N.C. App. at 433, 865 S.E.2d at 348 (citation omitted).

### III.    The State's Contention Regarding Robbery

Defendant next contends "because [Defendant] was acquitted of robbery at his prior jury trial, the trial court erred by allowing the State to contend that a robbery occurred." (Capitalization altered.) Defendant argues "the trial court's ruling that allowed evidence and argument about the robbery charge violated double jeopardy and rendered the trial fundamentally unfair."

The State argues this argument was not properly preserved for appeal since "[w]hen this trial began before the Honorable Thomas R. Wilson, [D]efendant did not object, despite two opportunities, when the trial court stated it was adopting" the "previous orders from [Judge] Powers from August 16th of 2021" which addressed Defendant's motion and "Defendant also did not object during evidence or argument in this trial." Defendant responds in his reply brief that

> [t]he State is correct that defense counsel did not object during trial to the law enforcement witnesses' statements that this was a robbery, nor to the State's closing arguments. However, the trial court's ruling at issue was not a specific ruling on a piece of evidence, but a global ruling based on principles of double jeopardy and collateral estoppel regarding the State's ability to argue that a robbery occurred.

Defendant further states in his reply brief that his

> argument focuses mainly on the State's contentions during its closing argument that a robbery occurred. Even if the double-jeopardy/estoppel objection was not preserved by the pretrial motion, the trial court nevertheless had an

independent duty to intervene in grossly improper argument by the State, and it did not do so.

This Court has consistently determined

> [u]nder our Rules of Appellate Procedure, "in order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1). The objection must be made in the presence of the jury. *See State v. Snead*, 368 N.C. 811, 816, 783 S.E.2d 733, 737 (2016) ("An objection made only during a hearing out of the jury's presence prior to the actual introduction of the testimony is insufficient." (citation and quotation marks omitted)). But if the party made a specific objection outside the presence of the jury, a general objection in the presence of the jury can be sufficient when it is clear from context the party was renewing the same objection made outside the presence of the jury. *See State v. Rayfield*, 231 N.C. App. 632, 637-38, 752 S.E.2d 745, 751 (2014) (holding an issue was preserved for appellate review when the defendant made an objection at trial that did not state the grounds for the objection because it was "clear from the context" the defendant was renewing an earlier objection made in a pretrial motion to suppress).

*State v. Jones*, 288 N.C. App. 175, 180, 884 S.E.2d 782, 788-89 (2023) (brackets omitted). Although Defendant originally filed a pretrial motion *in limine* as to the State's reference to robbery before the 2021 mistrial, when the trial court in this trial stated it would be adopting the ruling, Defendant did not object. Further, Defendant's initial pretrial objection did not preserve for appeal the State's witness's testimony as to whether a robbery had occurred since Defendant did not object to this testimony at trial. And as Defendant did not argue plain error in his initial brief, we

are likewise unable to review his argument under the plain error standard. *See State v. Lawrence*, 365 N.C. 506, 516, 723 S.E.2d 326, 333 (2012) ("To have an alleged error reviewed under the plain error standard, the defendant must 'specifically and distinctly' contend that the alleged error constitutes plain error." (citations omitted)). Still, we review Defendant's argument the trial court should have intervened in the State's closing arguments when the State argued a robbery occurred. *See State v. Parker*, 377 N.C. 466, 471, 858 S.E.2d 595, 599 (2021) ("When [the] defendant does not object to comments made by the prosecutor during closing arguments, only an extreme impropriety will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." (citation, quotation marks, and ellipses omitted)). But since the State's references to the alleged robbery were not improper, this argument is without merit.

Under the Fifth Amendment to the United States Constitution, "[n]o person shall be . . . subject for the same offense to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V. Citing *Dowling v. United States*, 493 U.S. 342, 107 L. Ed. 2d 708 (1990), this Court stated

> evidence is inadmissible under the Double Jeopardy Clause only when it falls within the scope of the collateral estoppel doctrine. That doctrine provides that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."

*State v. Bell*, 164 N.C. App. 83, 89, 594 S.E.2d 824, 828 (2004) (citation and quotation marks omitted).

In *Dowling*, "a man wearing a ski mask and armed with a small pistol robbed the First Pennsylvania Bank[.]" 493 U.S. at 344, 107 L. Ed. 2d at 715. The defendant was later charged with "federal crimes of bank robbery . . . and armed robbery . . . and with various crimes under Virgin Islands law." *Id.*

> During [the defendant's] third trial [for robbing the bank], the Government, over [the defendant's] objection, called a woman named Vena Henry to the stand. Ms. Henry testified that a man wearing a knitted mask with cutout eyes and carrying a small handgun had, together with a man named Delroy Christian, entered her home in Frederiksted approximately two weeks after the First Pennsylvania Bank robbery. Ms. Henry testified that a struggle ensued and that she unmasked the intruder, whom she identified as [the defendant]. Based on this incident, [the defendant] had been charged under Virgin Islands law with burglary, attempted robbery, assault, and weapons offenses, but had been acquitted after a trial held before his third trial in the bank robbery case.

*Id.* at 344-45, 107 L. Ed. 2d at 715.

> After a hearing, the District Court characterized the testimony as highly probative circumstantial evidence and ruled that it was admissible under Rule 404(b). When Henry left the stand, the District Court instructed the jury that [the defendant] had been acquitted of robbing Henry, and emphasized the limited purpose for which Henry's testimony was being offered. The court reiterated that admonition in its final charge to the jury.

*Id.* at 345-46, 107 L. Ed. 2d at 716. On appeal, the defendant contended the government should not have been allowed to use evidence of the robbery of Ms. Henry

in the defendant's third trial for the bank robbery since he was previously acquitted of robbing Ms. Henry. *Id*. at 348, 107 L. Ed. 2d at 716-17. The Supreme Court determined "the prior acquittal did not determine an ultimate issue in the present case." *Id*. This was "[b]ecause a jury might reasonably conclude that [the defendant] was the masked man who entered Henry's home, even if it did not believe beyond a reasonable doubt that [the defendant] committed the crimes charged at the first trial, the collateral-estoppel component of the Double Jeopardy Clause is inapposite." *Id*. at 348-49, 107 L. Ed. 2d at 718.

In *State v. Agee*, the defendant was acquitted of misdemeanor possession of marijuana, but the trial court allowed admission of evidence of possession of marijuana in the defendant's subsequent trial for possession of LSD despite the defendant's previous acquittal. *See* 326 N.C. 542, 548, 391 S.E.2d 171, 174 (1990). Our Supreme Court upheld the trial court's decision allowing the evidence of marijuana possession, stating

> [e]vidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or if it forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.

*Id*. (brackets omitted).

The holding in *Agee* is similar to this case since both cases involve a continuous series of events that resulted in an acquittal for one charge at a prior trial, but in the

later trial evidence was presented about the same series of events addressed in the earlier trial. *See id*. The State's theory here was that Defendant had intentionally shot at Beth and that assault with a deadly weapon resulted in the death of Jon. The State's discussion of robbery was only used to explain the chain of events that led to the intentional shooting of Beth and Jon. As the State notes, the portion of the argument cited by Defendant as improper is in the State's rebuttal after Defendant argued in his closing argument that "[t]here's no evidence that there was any plan or purpose to commit any crime when" Defendant and his friend were in the Apartment. Therefore, in accord with our Supreme Court and the Supreme Court of the United States, whether or not a robbery occurred, the evidence was without objection and tended to explain the chain of events leading to the shooting. The trial court did not abuse its discretion by not intervening in the State's closing argument. *See Dowling*, 493 U.S. at 348-49, 107 L. Ed. 2d at 718; *see also Agee*, 326 N.C. at 548, 391 S.E.2d at 174.

## IV.   The Victim's Prior Convictions, Gang Affiliation, Tattoo, and Firearms

Defendant argues "the trial court's exclusion of evidence of [Jon's] prior convictions, gang affiliation, 'Thug' tattoo, and possession of assault rifles, particularly after the State opened the door to the evidence, was reversible error." (Capitalization altered.) Defendant's arguments address North Carolina Rules of Evidence 404, 405(b), and 406. Defendant breaks this argument into two sections: (1) "[e]vidence of [Jon's] violent character was relevant to determining whether he

was the aggressor" and (2) "[t]he same evidence was admissible to rebut the State's evidence of [Jon's] peaceable character and [Beth's] testimony about their gun habits." We will address each argument in turn.

"The standard of review for assessing evidentiary rulings is abuse of discretion. A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *See State v. Combs*, 182 N.C. App. 365, 375, 642 S.E.2d 491, 499 (2007) (citations and quotation marks omitted).

North Carolina Rule of Evidence 404 states

> (a) Character evidence generally. - Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
>
> . . . .
>
> (2) Character of victim. - Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor[.]

N.C. Gen. Stat. § 8C-1, Rule 404(a)(2) (2023). North Carolina Rule of Evidence 405(b) provides "Specific instances of conduct. – In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct." N.C. Gen. Stat. § 8C-1, Rule 405(b)

(2023).  North Carolina Rule of Evidence 406 states

> [e]vidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

N.C. Gen. Stat. § 8C-1, Rule 406 (2023).

## A. Admissibility of the Evidence to show Jon was the Aggressor

We first address Defendant's argument asserting the evidence should have been admitted to show Jon was the aggressor.  Defendant contends "evidence of the victim's character may be admissible for two reasons: 'to show [the] defendant's fear or apprehension was reasonable or to show the victim was the aggressor'" but recognizes "[h]ere, [Defendant] was not aware of [Jon's] violent reputation, so the first prong is inapplicable.  However, the proffered evidence was admissible because it tended to show [Jon] was an aggressor."

> Well-settled exceptions to the general rule are recognized in cases where there is a plea of self-defense. In such a case, evidence of a deceased's violent or dangerous character is admissible where (1) such character was known to the accused, or (2) the evidence of the crime is all circumstantial or the nature of the transaction is in doubt.

*State v. Winfrey*, 298 N.C. 260, 262, 258 S.E.2d 346, 347 (1979) (citation omitted).

Defendant only argues here that "the nature of the transaction is in doubt."  Further, Defendant only contends the evidence could be used as specific instances of conduct under Rule 405(b), not general reputation evidence of Jon's violent character under

Rule 405(a). However, this Court previously addressed this exact argument in Defendant's prior appeal:

> We conclude that the evidence concerning Jon's gang membership, his possession of firearms, and his tattoo do not involve "specific instances of conduct" admissible under Rule 405(b). Therefore, we conclude that the trial court did not err by excluding this evidence. Further, we note that there was evidence presented to the jury that Jon was a drug dealer and possessed multiple guns in his residence at the time of the shooting.

*State v. Greenfield*, 262 N.C. App. 631, 637, 822 S.E.2d 477, 482 (2018), *rev'd on other grounds*, 375 N.C. 434, 847 S.E.2d 749 (2020). And while Defendant notes "prior evidentiary rulings are not binding" and the testimony as a whole was different in Defendant's second trial, this contention mostly goes to Defendant's next argument, that Defendant should have been allowed to rebut the State's evidence of Jon's peaceable character. And Defendant again argues here that this evidence was admissible only as specific instances of conduct, not as reputation evidence, so the same reasoning applies.

As to Jon's "prior conviction for armed robbery[,]" this Court also addressed this issue in Defendant's prior appeal:

> Regarding the victim's prior conviction for armed robbery, the trial court specifically ruled that the evidence was inadmissible under Rule 403, based on its conclusion that unfair prejudice outweighed the probative value of the evidence. . . . Whether otherwise admissible evidence should be excluded under Rule 403 is left to the sound discretion of the court. Here, Defendant has made no argument that the trial court erred in excluding Jon's prior

> conviction under Rule 403. Therefore, we conclude that Defendant failed to meet his burden on appeal as to this issue.

*Id*. (citation omitted). Again, despite this being a separate trial, the same reasoning applies here. First, the trial court again based its ruling regarding Jon's prior convictions on "the balancing test established by Rule 403 of the North Carolina Rules of Evidence." And on appeal Defendant briefly mentions Rule 403 in his discussion about the standard of review, but Defendant does not further argue the convictions should be allowed under Rule 403. Therefore, this Court's previous rationale about evidence of Jon's prior convictions applies here since the trial court again excluded the convictions under Rule 403, and Defendant does not argue in this section of his brief that the convictions should be admissible to show Jon was the aggressor.

Defendant's argument that the evidence of Jon's prior convictions, gang affiliation, tattoo, and possession of firearms should have been admitted to show Jon was the aggressor is overruled. However, we must still address whether the same pieces of evidence should have been admitted to "rebut the State's evidence of [Jon's] peaceable character and [Beth's] testimony about their gun habits."

## B. Admissibility of the Evidence to Rebut the State's Evidence

Defendant argues the evidence should have been allowed "as rebuttal because the State opened the door by offering evidence of [Jon] and [Beth's] good and peaceable character and their gun habits."

### 1. *Jon's Firearms*

We first address whether the trial court erred in excluding evidence of Jon's firearms. We note here that Defendant's brief does not distinguish that evidence of some of Jon's firearms was excluded but the trial court allowed evidence of others; specifically, the trial court's order was an "order excluding evidence of [Jon's] firearms *not of [the] type used in [the] alleged offense*." (Emphasis added.) The trial court made findings regarding Jon's firearms:

> 1. During a search of [Jon's] residence . . . six firearms were located and seized by investigators of the Wilmington Police Department.
>
> 2. Four of those firearms . . . were capable of firing casings and projectiles recovered from the crime scene.
>
> . . . .
>
> 6. The two firearms not tested by the state crime lab, a Diomandback model DB-15 rifle and the Sporter caliber 7.62 x 39 rifle are incapable of firing the projectiles and cartridges found at the scene[.]

The trial court ruled that allowing the two rifles into evidence "would be both irrelevant and unfairly prejudicial" and allowed the four handguns to be introduced at trial while excluding evidence of the two rifles recovered at the scene.

Defendant cites *State v. Johnston*, 344 N.C. 596, 476 S.E.2d 289 (1996), to contend he should have been allowed to introduce evidence of the rifles to show Jon and Beth's gun habits. However, *Johnston* involved a witness's testimony that "she had never known the victim to carry any type of weapon and that to her knowledge, the victim was not carrying a weapon on the night of his murder." *Id.* at 605, 476

S.E.2d at 294. Our Supreme Court concluded the "testimony was relevant and admissible to show that the victim was unarmed when he was murdered" and "[e]vidence that a victim was peaceful and unarmed at the time of his murder is relevant to prove that the victim did not provoke the defendant and that the murder was committed with premeditation and deliberation." *Id.*

Here, Beth did not testify at any point that Jon did not own weapons, but she testified he typically did not have weapons out in the open. The evidence showed Beth grabbed a handgun in the bedroom before she went out to the living room and she put the gun on the table in the living room, where Jon was. There is a dispute as to which person fired the first shot, but the testimony for the State and Defendant tended to show Defendant had a gun, although Defendant testified the gun was Jon's, and there was a gun near Beth and Jon. While the facts in *Johnston* involved testimony that the victim never carried a gun and did not have a gun on the night of his murder, this case presents a very different situation. *See id.* Instead, there was evidence presented that Jon owned guns and that there was a gun on the table near Jon. At trial, Defendant testified that the handgun he used to shoot Jon was Jon's handgun, while Beth disputed this point in her testimony. And as the trial court noted, the two rifles excluded from evidence could not have been involved in the shooting since the projectiles and casings came from handguns. Thus, *Johnston* is inapposite to this case. *See id.*

Further, Defendant did not argue in his response to the State's motion to

exclude evidence of the rifles nor at trial that evidence should be admitted regarding the rifles as habit evidence under Rule 406. We will thus not address Defendant's argument as to Rule 406 as habit evidence. *See State v. Sharpe*, 344 N.C. 190, 194, 473 S.E.2d 3, 5 (1996) ("This Court has long held that where a theory argued on appeal was not raised before the trial court, the law does not permit parties to swap horses between courts in order to get a better mount in the Supreme Court." (citations and quotation marks omitted)). And as Defendant was allowed to testify about handguns Jon had, Beth testified about handguns belonging to either her or Jon in the Apartment, and the rifles that were excluded were not used in the commission of a crime, we conclude this argument has no merit. *See State v. Patterson*, 284 N.C. 190, 194, 200 S.E.2d 16, 19 (1973) ("The general rule is that weapons may be admitted in evidence where there is evidence tending to show that they were used in the commission of a crime." (citation and quotation marks omitted)).

### 2. *Jon's Prior Convictions, Tattoo, and Gang Affiliation*

Defendant argues that since the State "presented favorable character evidence for [Jon] and [Beth] starting with its first witness, [Jon's] sister[,]" including "a photograph of [Jon] in his military uniform and . . . a photograph of [Jon] with family[;]" testimony from "neighbors who testified that [Jon] and [Beth] were 'pleasant and nice' 'very busy' and 'hardworking[;]'" and Beth's testimony that "I genuinely know from [Jon's] character that in that situation, he did not only not want any conflict for himself or want to get shot, but, as well, he would not want this

conflict for [Defendant]." We conclude there was no error.

We reiterate

> [character] evidence may be admitted, however, when testimony regarding a *pertinent character trait* of the victim (here, the decedent) is offered by the defendant in a criminal case. N.C. Gen.Stat. § 8C-1, Rule 404(a)(2). In cases where self-defense is at issue, evidence of a victim's violent or dangerous character may be admitted under Rule 404(a)(2) when (1) such character was known to the accused, or (2) the other evidence of the crime is *all circumstantial* or the nature of the transaction is in doubt.

*State v. McGrady*, 232 N.C. App. 95, 108, 753 S.E.2d 361, 371 (2014) (emphasis in original) (citations, quotation marks, and brackets omitted).

Again, as Defendant did not know of Jon's past convictions, gang affiliations, or tattoo and does not argue the evidence was circumstantial, character evidence regarding Jon must be based on "the nature of the transaction [being] in doubt." *Id.* Defendant argues that since there were different accounts of the incident by Defendant and the State's witnesses, the nature of the transaction was in doubt.

In *McGrady*, the defendant attempted to present evidence from a doctor who had interviewed the victim:

> Dr. Brittain testified that the [victim] was angry and frustrated with many "areas" of his life. By his second meeting with the [victim], Dr. Brittain had begun "to surmise" that the decedent was dealing with "aggression," "thoughts of violence," and "conflict that he had with the people that were around him." In that meeting, Dr. Brittain and the [victim] discussed "the violence," and Dr. Brittain stressed the need for the [victim] to avoid being either the victim or the perpetrator in a confrontation. Dr.

> Brittain also referred to the [victim] as "a very angry man,"
> but noted that he was taking his medication, "had not
> perpetrated violence," and, in the [victim's] words, was
> "trying to not become angry and harm someone." When
> asked about the source of the [victim's] anger, Dr. Brittain
> testified that it "permeated all of his life," but noted that
> the source was not specifically related to [the d]efendant,
> who was not discussed during the meetings.

*Id*. at 107, 753 S.E.2d at 370-71 (brackets omitted).  The trial court excluded this

evidence under Rule 404(a) as improper character evidence.  *See id*. at 107, 753 S.E.2d

at 371.  This Court concluded the trial court's exclusion of the evidence was not error

since

> Dr. Brittain's testimony—as the trial court noted in
> excluding it under Rule 404(a)—does not constitute
> evidence of the [victim's] character for violence. When
> asked about his meetings with the [victim], Dr. Brittain
> testified to the fact that the [victim] was an angry person
> who had thoughts of violence. He did not, however, testify
> to his opinion that the decedent was, inherently, a man of
> violent character or even a violent person as distinguished
> from others.

*Id*. at 109, 753 S.E.2d at 372.

Here, the testimony Defendant contends opened the door to the evidence about

Jon's tattoo, gang affiliation, and past convictions was:  (1) a photograph of Jon in his

military uniform; (2) a photograph of Jon with his family; (3) testimony from Jon's

sister that "he maintained contact with his children and supported them

financially[;]" (4) testimony from Jon's neighbor that he was "pleasant and nice,"

"very busy," and "hardworking[;]" (5) testimony from Beth that "knowing [Jon] . . .

- 29 -

hearing him that night, you know '[y]ou don't have to do this man' . . . and '[p]lease don't' it sounded like he was begging" which Defendant contends portrayed Jon as a scared victim; and (6) testimony from Beth which stated

> I genuinely know from [Jon's] character that in that situation, he did not only not want any conflict for himself or want to get shot, but, as well, he would not want this conflict for [Defendant]. [Jon] would not want something like this, this situation right now, to happen to [Defendant].

However, under *McGrady*, none of this evidence concerns any of Jon's "pertinent character trait[s]" or character of his peacefulness. *Id.* at 108, 753 S.E.2d at 371. Testimony tending to show Jon was in the military, had a family, maintained contact with his children and supported them financially, and was "very busy" and "hardworking" does not go to Jon's character for peacefulness and are not pertinent character traits as to whether Jon was violent. *See id.* Further, testimony from Beth that it sounded like Jon was begging for his life in that moment likewise does not go to Jon's character for peacefulness. Even assuming Defendant's assertion that this testimony made Jon out to be a scared victim is correct, this evidence does not indicate whether Jon was generally peaceful or non-violent.

Testimony from Jon's neighbor that Jon and Beth were "pleasant and nice" is perhaps a closer call than the testimony referenced above; however, it does not explicitly or implicitly contend Jon was peaceful, considering this Court's discussion in *McGrady* where we concluded a witness's testimony that the victim was "an angry

person who had thoughts of violence" but the witness "did not, however, testify to his opinion that the [victim] was, inherently, a man of violent character or even a violent person as distinguished from others." *Id*. at 109, 753 S.E.2d at 372.

As we previously decided testimony that a victim was an angry person was not the same as testifying the victim was violent, we do not consider testimony that Jon was "pleasant and nice" as being the same as testifying Jon was peaceful. *See id.* Finally, Beth's testimony that "from [Jon's] character that *in that situation*, he did not only not want any conflict for himself or want to get shot, but . . . he would not want this conflict for [Defendant]" does not discuss Jon's character for being peaceful in general. Beth was specifically discussing the situation at hand, and simply using the word "character" does not mean Beth was testifying about Jon's general character for being peaceful. We conclude the trial court did not err by excluding evidence of Jon's gang affiliation, prior convictions, and tattoo as the testimony cited by Defendant does not open the door to rebuttal evidence of Jon's character for violence. This argument is overruled.

## C. Constitutional Argument

Defendant also briefly argues that he had a constitutional right to present a complete defense and the evidence should have been admitted for that reason. "This Court reviews constitutional issues *de novo*." *State v. Williams*, 261 N.C. App. 516, 518, 820 S.E.2d 521, 523 (2018) (citation omitted). However, while Defendant raised his constitutional right to a complete defense in his written pretrial motion, he did

not raise this issue again during trial.  Defendant properly preserved his objections to this evidence under the Rules of Evidence since he made an offer of proof at trial, but his objections and offer of proof were based only on the Rules of Evidence. Defendant did not argue his constitutional right to a complete defense in his objections or offer of proof.   Therefore, this constitutional issue is not properly preserved and we will not address it further.  *See Jones*, 288 N.C. App. at 180, 884 S.E.2d at 788-89; *see also State v. Mills*, 232 N.C. App. 460, 466, 754 S.E.2d 674, 678 (2014) ("Our appellate courts will only review constitutional questions raised and passed upon at trial." (citations omitted)).

## V.   Opinions Regarding Credibility and Guilt

Finally, Defendant argues "the trial court committed plain error by allowing Detective Odham and the Prosecutors to give improper and prejudicial opinions on credibility and guilt."  (Capitalization altered.)  As Defendant did not object to the officer's testimony during trial, we review only for plain error.  *See Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334 ("Because [the] defendant did not object at trial, we review for plain error. To establish plain error, [the] defendant must show that the erroneous jury instruction was a fundamental error—that the error had a probable impact on the jury verdict.").  Further, as to closing arguments, Defendant again did not object, therefore

> [t]he standard of review for assessing alleged improper
> closing arguments that fail to provoke timely objection
> from opposing counsel is whether the remarks were so

> grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*. In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.

*Parker*, 377 N.C. at 471, 858 S.E.2d at 599 (citation omitted).

## A. Officer's Testimony

Defendant contends Detective Odham gave improper opinion testimony when he "testified he never believed [Defendant] was using self-defense" and when he "said the voicemail answered an ultimate issue in the case, that Jon and Beth 'were being robbed by [Defendant]'" and his friend.

Rule 701 of the North Carolina Rules of Evidence states

> [i]f the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C. Gen. Stat. § 8C-1, Rule 701 (2023). Rule 704 of the North Carolina Rules of Evidence provides, "[t]estimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." N.C. Gen. Stat. § 8C-1, Rule 704 (2023). In interpreting these two rules, this Court has stated

Rule 704 does allow admission of lay opinion evidence on ultimate issues, but to qualify for admission the opinion must be helpful to the jury. Meaningless assertions which amount to little more than choosing up sides' are properly excludable as lacking helpfulness under the Rules. Furthermore, while opinion testimony may embrace an ultimate issue, the opinion *may not* be phrased using a legal term of art carrying a specific legal meaning not readily apparent to the witness.

*State v. Elkins*, 210 N.C. App. 110, 124, 707 S.E.2d 744, 754 (2011) (emphasis in original) (citations, quotation marks, and brackets omitted).

Here, the full context of Detective Odham's testimony is as follows:

Q. And it does indicate in the records that [Defendant] did sleep in the night that evening, correct?

A. It does.

Q. And you said it's your philosophy to trust and verify a witness until you have reason not to, or until it could be - - to see if it can be corroborated; is that fair to say?

A. Yes, sir.

Q. And did, in fact, your later investigation corroborate [Beth's] story?

A. Yes.

Q. And how did it do so?

A. Well, the investigation itself, the ballistics, right up until we received the voicemail, that painted a clear picture of what had transpired in that house on February 2nd, 2015. That detailed through that voicemail that [Jon] and [Beth] were being robbed by [Defendant] and [Defendant's friend].

Q. And you brought up self-defense to . . . [D]efendant in

the first interview; is that correct?

A. I did.

Q. He never mentioned that prior to that?

A. No.

Q. Again, what was the purpose of you bringing that up?

A. To get him to continue to talk.

Q. Did you believe at any point in time that [Defendant] was utilizing self-defense inside that residence?

A. No.

We first note since Defendant was previously acquitted of robbery, he was not facing a robbery charge in this case either independently or as a basis for first-degree murder under the felony murder rule. As whether Defendant was, in fact, committing a robbery here is not an element of any of the crimes submitted to the jury, it is not an ultimate issue in this case. *See State v. Daye*, 83 N.C. App. 444, 445-46, 350 S.E.2d 514, 515-16 (1986) (discussing whether a witness's use of the term "concealing" when "willful concealment of merchandise" was "an essential element of the offense" was error).

Further, Detective Odham was not testifying as to the credibility of Beth as Defendant contends; he was testifying that his investigation corroborated Beth's version of events based on his own perception of the evidence, especially since Detective Odham interviewed Defendant before discovery of the audio recording and would have been familiar enough with Defendant's voice to form an opinion as to

whose voice was on the audio recording. *See State v. Crabtree*, 249 N.C. App. 395, 402-03, 790 S.E.2d 709, 715 (2016) (concluding a witness's statement that "'we have sort of five categories all the way from, you know, we're really sure sexual abuse didn't happen to yes, we're really sure that sexual abuse happened' and her reference to the latter category as 'clear disclosure' or 'clear indication' of abuse, in conjunction with her identification of that category as the one assigned to L.R.'s 23 December 2013 interview, crosses the line from a general description of the abuse investigation process into impermissible vouching" (brackets omitted)); *see also State v. Hill*, 247 N.C. App. 342, 347, 785 S.E.2d 178, 182 (2016) (determining the trial court did not abuse its discretion in allowing officer testimony that two officer's identified the defendant from surveillance video since they had previous interactions with the defendant and thus "the officers' testimony was rationally based on their special knowledge of [the defendant's] appearance and was helpful to the jury's determination of whether [the defendant] was the person seen in the video").

As to Detective Odham's testimony regarding self-defense, Detective Odham first testified that he brought up self-defense during the questioning to get Defendant to keep talking to law enforcement. The first statements made by Detective Odham explaining why he brought up self-defense were not error since he was not testifying whether he believed Defendant was acting in self-defense; Detective Odham was testifying as to why he first brought up the issue of self-defense. Earlier in his testimony, Detective Odham similarly explained after being asked "[w]as there any

mention of self-defense at all prior to you bringing it up in this interview" that there was not and he brought it up "[t]o literally, like I told him, to give him an out, to give him a reason for being there and a reason for what happened, to keep him talking. Several reasons." Thus, in context, when Detective Odham was asked whether he believed at any point Defendant was acting in self-defense and Detective Odham replied no, Detective Odham was not necessarily commenting on whether Defendant acted in self-defense but was explaining why he brought that up in his interviews with Defendant. Detective Odham's testimony regarding self-defense was not error.

**B. Closing Arguments**

As to the State's closing arguments, Defendant contends the State improperly argued that Beth "was truthful, that [Defendant] was lying, that this was a robbery, that [Jon] would 'never' have behaved in certain ways." As we addressed the State's closing arguments as to robbery above, we will not address that issue again.

Our Supreme Court has explained "[a] lawyer's function during closing argument is to provide the jury with a summation of the evidence[.]" *State v. Tart*, 372 N.C. 73, 80, 824 S.E.2d 837, 842 (2019) (citation omitted).

> Regarding closing arguments made to the jury during criminal trials, the North Carolina General Statutes provide that an attorney may not: (1) become abusive, (2) express his personal belief as to the truth or falsity of the evidence, (3) express his personal belief as to which party should prevail, or (4) make arguments premised on matters outside the record. Through our precedent, this Court has elaborated on the statutory provisions governing closing arguments and emphasized that closing arguments must:

(1) be devoid of counsel's personal opinion; (2) avoid name-calling and/or references to matters beyond the record; (3) be premised on logical deductions, not on appeals to passions or prejudice; and (4) be constructed from fair inferences drawn only from evidence properly admitted at trial.

*Id.* (citations and quotation marks omitted).

Here, much of the argument cited by Defendant is the State reviewing each of the nine versions of events Defendant told to law enforcement, which Defendant admitted were lies in his testimony. The State does repeatedly refer to these many statements as lies, and then states

> [h]e's lying about the number of times he's lied.
>
> Members of the jury: I submit to you, you cannot believe anything that comes out of that man's mouth. He gets caught in a lie, and what does he do? He changes his story. He changes his story to fit what he knows the officer's already know.

As to Beth, the State argued

> [j]ust like Detective Odham told you, [Beth's] story has not changed since day one. She has maintained this entire time that two men came to her apartment, tried to rob her and her boyfriend, and that they shot her and they shot and killed her boyfriend, and they did so after they disarmed her.
>
> . . . .
>
> [Beth] gave an account completely consistent with an audio recording of what happened. . . . That's corroboration. That proves [Beth] isn't lying.

Our Supreme Court recently addressed the issue of calling a defendant a "liar"

or insinuating a defendant was lying during closing arguments:

> [The] defendant argues the prosecutor's repeated statements insinuating that [the] defendant lied were improper. Over the course of his argument, the prosecutor used some variation of "lie" at least thirteen times, though never directly calling [the] defendant a liar. "Innocent men don't lie" appeared to be the State's theme: the prosecutor used it at the beginning of his closing argument and again when beginning his rebuttal. The prosecutor also referred to [the] defendant's claim of self-defense as "just not a true statement." The prosecutor commented that the unidentified man involved in the shooting scenario was "imaginary" and "simply made up." The prosecutor also asserted [the] defendant engaged in "the act of lying" and "tried to hide the truth from you all." Relying on *Hembree*, [the] defendant argues that even though the prosecutor did not directly call [the] defendant a liar, the effect and intimations of his statements are also improper. 368 N.C. at 19-20, 770 S.E.2d at 89.

> A prosecutor is not permitted to insult a defendant or assert the defendant is a liar. *See Jones*, 355 N.C. at 133-34, 558 S.E.2d at 107; *Miller*, 271 N.C. at 659, 157 S.E.2d at 345 ("A prosecutor can argue to the jury that they should not believe a witness, but he should not call him a liar."). A prosecutor is permitted to address a defendant's multiple accounts of the events at issue to suggest that the defendant had not told the truth on several occasions and the jury could find from this that he had not told the truth at his trial. In this case there is no doubt the prosecutor's statements directed at [the] defendant's credibility are improper. Statutorily, the prosecutor is not permitted to inject his opinion as to the truth or falsity of the evidence or comment on a defendant's guilt or innocence during his argument. Here the prosecutor injected his own opinion that [the] defendant was lying, stopping just short of directly calling [the] defendant a liar, and his theme, "innocent men don't lie," insinuated that because [the] defendant lied, he must be guilty. The focus of the prosecutor's argument was not on presenting multiple

conflicting accounts and allowing the jury to come to its own conclusion regarding [the] defendant's credibility. Rather, the State's argument appeared to overwhelmingly focus on attacking [the] defendant's credibility through the prosecutor's personal opinion.

*State v. Huey*, 370 N.C. 174, 181-82, 804 S.E.2d 464, 470-71 (2017) (citations, quotation marks, and brackets omitted). Despite concluding the prosecutor's statements in *Huey* were improper, the Court determined the defendant had failed to show prejudice. *See id.*

In *State v. Solomon*, our Supreme Court also addressed a situation where the defendant had given differing accounts of the events, and the prosecutor argued he was "*lying his head off* about what happened[;]" the defendant "*c[a]me up with a cock and bull story*[;]" the defendant "expect[s] you to brush away everything that's been said and every untruth he's ever told like you're suppose to say, we'll [sic] *let's give him best one out of four*[;]" and "[t]he thing about [the defendant] is he has not dealt with the truth in so long that he's forgot what it is. . . . He wants to boldly come in here *after giving what he says are three untruthful statements* and pull the wool over your eyes." 340 N.C. 212, 218, 456 S.E.2d 778, 783 (1995) (emphasis in original) (ellipses omitted). The Court concluded "[c]learly, in light of the defendant's own testimony, the prosecutor did not inject his own beliefs, personal opinions or knowledge into his jury argument. Rather, the prosecutor's remarks were consistent with the facts in evidence from the defendant himself and the reasonable inferences drawn therefrom" and "[a]ssuming *arguendo* that the statements which the

defendant now complains of were improper, the impropriety was not so gross or excessive that we would conclude the trial court abused its discretion by failing to intervene *ex mero motu*." *Id*. at 220, 456 S.E.2d at 784.

Here, the State never explicitly called Defendant a liar, but stated "you cannot believe anything that comes out of that man's mouth" and other comments insinuating Defendant was lying. But Defendant admitted at trial to changing his story eight times to law enforcement before giving his ninth and final version, so even if the State's arguments were improper, they were certainly not "so gross or excessive that we would conclude the trial court abused its discretion by failing to intervene *ex mero motu*." *Solomon*, 340 N.C. at 220, 456 S.E.2d at 784; *see also Huey*, 370 N.C. at 181-82, 804 S.E.2d at 470-71. Similarly, explaining Beth's story did not change throughout the investigation and trial is not the same as claiming Beth was a truthful person. Defendant's arguments as to the State insinuating Defendant was lying and that Beth's story did not change are overruled.

Finally, as to Defendant's argument about the State discussing how Jon would behave, the State argued

> [Jon] is a former Marine. He would never keep a gun laying out on a table, especially when he is about to sell weed. He would never.
>
> In the almost two years that [Beth] was with him, she had never seen a gun laying out in the living room anywhere, and if you think back to the other handguns that were recovered in this case, where were they?

Defendant's argument in this issue focuses more on Defendant's and Beth's versions of events and the State's remarks about Defendant lying or Beth telling the truth. Defendant does not show how the State arguing Jon would or would not behave in a certain way is improper. And as the State supports the argument that Jon would not leave a gun out on the table while selling marijuana with Beth's testimony that she had "never seen a gun laying out in the living room[,]" it was a reasonable inference for the State to argue Jon would not have left a gun out on the table. *See State v. Campbell*, 359 N.C. 644, 686, 617 S.E.2d 1, 27 (2005) ("The State's argument was that [the] defendant had victimized trusting people on previous occasions and that this occasion was no different. A closing argument may include the facts in evidence, as well as any reasonable inferences which arise therefrom. This argument is a reasonable inference, given [the] defendant's history of crime." (citation omitted)). This argument is overruled. Defendant has not demonstrated that the trial court erred by not intervening during the State's closing arguments.

## VI. Conclusion

We conclude the trial court did not err in denying Defendant's requested instruction as the instructions given accurately stated the law and would not mislead the jury as to whether Defendant had the requisite intent for felony murder. Further, the trial court did not err in allowing the State to argue a robbery occurred despite Defendant's previous acquittal of robbery since Defendant was not charged with robbery in this case directly or as a basis for felony murder, and collateral estoppel

does not apply. We also conclude the trial court did not err in excluding evidence of Jon's firearms, prior convictions, "Thug" tattoo, and gang affiliation. Finally, the trial court did not err, much less plainly err, in allowing Detective Odham's testimony or by not intervening in the State's closing argument *ex mero motu*.

NO ERROR.

Judges TYSON and GORE concur.